# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RIVERSIDE RISK ADVISORS LLC, | ) | |
| | ) | |
| Plaintiff/ Counterclaim Defendant, | ) ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0789-KSJM |
| | ) | |
| GRACE I CHING CHAO, | ) | |
| | ) | |
| Defendant/ Counterclaim Plaintiff, | ) ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOYCE FROST AND CHRISTOPHER FROST, | ) ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted:  July 11, 2022
Date Decided:  October 26, 2022
Date Corrected: October 28, 2022

John G. Harris, BERGER HARRIS LLP, Wilmington, Delaware; *Counsel for Plaintiff/Counterclaim Defendant Riverside Risk Advisors, LLC and Third-Party Defendants Joyce Frost and Christopher Frost.*

Grace I Ching Chao, *pro se*.

**McCORMICK, C.**

This case arises from the sort of unfortunate misunderstandings and ambiguous promises that too often plague early-stage companies. Husband and wife, Third-Party Defendants Joyce and Christopher ("Chris") Frost,[1] formed a derivatives advisory firm, Plaintiff and Counterclaim Defendant Riverside Risk Advisors LLC ("Riverside" or the "Company" and, together with the Frosts, the "Riverside Parties"). At formation, the Frosts were Riverside's sole members. Not long after forming Riverside, they promised a small interest in the company to one of its first employees, Defendant and Counterclaim Plaintiff Grace I Ching Chao. The parties discussed few details about the nature of Chao's interest. The Frosts believed they had given Chao shares as a precursor to the profit-sharing plan they would eventually formalize, and that she would enjoy a right to Riverside's profits only for the duration of her employment. Chao believed that the Frosts had made her a member of Riverside. But the original LLC agreement—based on a form acquired through LegalZoom, to which the court refers as the "LegalZoom Agreement"—established the manner for admitting new members to Riverside. And it is undisputed that no one took the actions prescribed by the LegalZoom Agreement to make Chao a member of Riverside.

In 2015, the Frosts caused Riverside to adopt a formal profit-sharing plan and a new LLC agreement (the "2015 LLC Agreement"). They offered Chao the option to keep her interests under the profit-sharing plan or to join Riverside as a non-managing member under the 2015 LLC Agreement. In response, Chao insisted that she was already a member

---

[1] For clarity, the court refers to Chris and Joyce Frost by their first names, without intending disrespect or familiarity.

of Riverside. She refused to sign the 2015 LLC Agreement based on the belief that it eliminated pre-established rights she had as a Riverside member.

The parties discussed a buyout of Chao's interest—whatever it was—to resolve their conflict. Then, in an email offer to Chao to purchase her equity, Chris stated that, should Chao refuse their offer, she would "remain as a member" under the "current" operating agreement. The Frosts understood the "current" operating agreement to be the 2015 LLC Agreement, as they had prepared and signed it a year prior. Because she had refused to sign the 2015 LLC Agreement, Chao understood "current" operating agreement to mean the LegalZoom Agreement. For years, the parties operated under these conflicting understandings.

The relationship between Chao and the Frosts soured over the course of Chao's tenure at Riverside. Eventually, Riverside terminated Chao's employment. Riverside filed this suit seeking declaratory judgment that Chao is not a member of Riverside and that the 2015 LLC Agreement is Riverside's governing instrument. In response, Chao brought counterclaims and third-party claims against the Riverside Parties for breach of contract, unjust enrichment, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. Chao asks this court to declare that she is a member of Riverside, that the LegalZoom Agreement governs, to award her damages, and to order Riverside to allow her to inspect Riverside's books and records.

This decision holds that, even if the LegalZoom Agreement governed, under its plain terms and Delaware's Limited Liability Company Act (the "LLC Act"), Chao is not

2

a member of Riverside. As a non-member, Chao could not block the adoption of the 2015 LLC Agreement, which is therefore Riverside's operating agreement.

As for Chao's counterclaims, although Chao's breach of contract claim raises thorny issues, the Frosts ultimately never agreed to give her a permanent equity interest in Riverside. The Frosts treated Chao as a non-managing member under the 2015 LLC Agreement, but Chao disclaimed—and continues to disclaim—that status. That leaves one alternative. Best understood, the Frosts granted Chao economic rights resembling profit-sharing interests that she would receive under the formalized profit-sharing agreement. As such, Chao was entitled to the distributions she received while employed at Riverside, but no more. Chao thus fails to prove that the Riverside Parties breached their obligations to her. For the same reasons, Chao's quasi-contract claims fail. Chao's implied covenant claim invokes a general moral duty instead of pointing to identifiable gaps in the relevant contract or showing bad faith on the part of the counterparties. Her implied covenant claim thus pushes the implied covenant beyond its scope under Delaware law. Chao's fiduciary duty claim fails because Chao was not a Riverside Member, so she was not owed fiduciary duties. Moreover, the operative LLC agreement—the 2015 LLC Agreement—waives fiduciary duties, as permitted under Delaware law. The Riverside Parties also assert a host of equitable defenses, but because Chao's claims fail on the merits, the court does not reach those issues.

The court enters judgment in favor of the Riverside Parties.

3

## I. FACTUAL BACKGROUND

Trial took place over three days. As reflected in the Joint Schedule of Evidence submitted by the parties, the record comprises 242 trial exhibits, live testimony from three fact witnesses, and deposition testimony from four fact witnesses. These are the facts as the court finds them after trial.[2]

### A. The Formation Of Riverside And The LegalZoom Agreement

After decades of working at some of the world's largest financial institutions, Chris and Joyce Frost decided to start Riverside, a derivatives advisory firm.[3] To this end, they purchased a package of form documents from LegalZoom, which included a certificate of formation, an LLC agreement, and instructions for forming a Delaware limited liability company. On September 17, 2009, LegalZoom filed Riverside's certificate of formation with the Secretary of State of Delaware, thus forming the Company.[4] Several weeks later, Chris and Joyce signed the LegalZoom Agreement as the sole members of Riverside.[5]

The LegalZoom Agreement established Riverside as a member-managed LLC and named Joyce and Chris as its "Members," holding 51% and 49% of the "Membership

---

[2] *See* C.A. No. 2019-0789-KSJM, Docket ("Dkt.") 154 (Joint Schedule of Evid., Ex. A). This decision cites to: C.A. No. 2019-0789-KSJM docket entries (by Dkt. number); trial exhibits (by "JX" number); the trial transcript (Dkts. 129–31) ("Trial Tr."); and deposition transcripts as "[Name] Dep." The parties lodged the deposition transcripts of the following witnesses: Joyce Frost, Chris Frost, Frank Iacono, and Grace I Ching Chao.

[3] Trial Tr. 9:10–10:9 (Chris); Trial Tr. 161:18–162:14 (Joyce).

[4] JX-4.

[5] JX-5 (LegalZoom Agreement).

Interests," respectively.[6]  These percentage interests reflected the capital that Joyce ($25,500) and Chris ($24,500) contributed to the company.[7]

Section 7.2 of the LegalZoom Agreement governed the transfer and acquisition of Membership Interests of Riverside, the text of which is quoted in full in the below legal analysis.  In brief, to admit a new member, Section 7.2 required that all existing Members execute a written consent and that the new Member agree to be bound by the terms of the LegalZoom Agreement.[8]

### B.      Iacono Joins Riverside.

In 2010, the Frosts hired Frank Iacono, with whom Joyce had previously worked.[9] They called him their "partner."[10]  Iacono, Chris, and Joyce decided they "would each be one-third partners in the business,"[11] with Iacono holding his interest through South Haven Financial LLC ("South Haven").[12]  Unlike the Frosts, Iacono (through South Haven) did

---

[6] LegalZoom Agreement § 4.1; *id.*, Ex. A.

[7] LegalZoom Agreement, Ex. A.

[8] LegalZoom Agreement § 7.2.

[9] Iacono Dep. 16:14–25 (explaining that while working at Chase, Joyce was "one of two people that [he] reported to" and "a mentor to [him]"); *id.* 79:25–80:6 (explaining that he worked with Joyce and that at Morgan Stanley, Joyce reported to him).  Iacono was also Chao's boss when they were at Lehman Brothers and Morgan Stanley.  *Id.* 10:20–23, 13:12–22.

[10] *Id.* 17:6–17; *id.* 82:3–9 (testifying that his title was "partner").

[11] Trial Tr. 164:10–20 (Joyce).

[12] *See* Iacono Dep. 65:19–23 ("South Haven Financial LLC is a single member LLC with me as the sole member out of which I conduct certain businesses, including a consulting business and certain investments."); Trial Tr. 34:22–35 (Chris) (testifying that South Haven Financial LLC "was Frank's LLC that he did some of his advisory business through").

not make a capital contribution; he instead contributed "the single biggest engagement for the firm," which they agreed "would serve in lieu of a capital contribution."[13]

The agreement between the Frosts and Iacono "wasn't that formal."[14] Iacono's interest was recorded in a handwritten Membership Interest Transfer Ledger produced by the Riverside Parties, but there is no evidence that the parties followed Section 7.2 of the LegalZoom Agreement to make Iacono a Member.[15] Despite this lack of formality, the record is clear that Iacono "shared responsibility" with and exercised the same "decisionmaking" powers as the Frosts.[16] The Frosts indisputably thought of Iacono as an equal, and at no point have they disputed his membership status.[17] Iacono was never a W-2

---

[13] Iacono Dep. 82:21–83:6.

[14] *Id.* 171:16–172:15.

[15] JX-195; JX-196; JX-227 at 6; Iacono Dep. 40:15–24 ("Q. As far as you know, Mr. Iacono, did your one-third membership interest in Riverside, was that ever reflected in what I'll refer to as the books and records of the company or stock ledger, as far as you know? A. I'll tell you where I recall it being reflected. I recall it being reflected in the company's 10-Ks in those early years, but I don't remember it being reflected really in any other document."); *id.* 81:18–25 ("I don't recall asking to see or sign an operating agreement when I became a member of Riverside. It doesn't mean that I didn't, I just don't recall.").

[16] Iacono Dep. 18:11–17.

[17] *See, e.g.*, Trial Tr. 19:7–19 (Chris) (describing "joint decision-making on all important matters" between himself, Joyce, and Iacono); *id.* 243:11–244:11 (Joyce) ("Q. Was Frank a member? A. Definitively, yes. Q. When did he become a member? A. He became a member in 2018, without question, when he signed the operating agreement. Q. Was he a member before that? A. Grace, that's—a member is fine, but that's a legal conclusion, so I can't necessarily address that. He was a partner. He was a partner with us. He had voting rights or management, so early on, I would have considered him, but it's a legal matter because, you know, he hadn't formally signed the LegalZoom agreement, but he had all the same responsibilities that we did, voting rights, information. . . . But no question after he signed the operating agreement in 2018. Q. And why didn't he sign the LegalZoom agreement? A. Because—well—he knew of its existence, but it didn't have the commercial terms that were necessarily appropriate for third parties. It was great for

6

employee of Riverside,[18] nor did he later participate in Riverside's profit-sharing arrangement.[19]  Like the Frosts, and unlike Riverside employees, Iacono was not given annual performance reviews.[20]

### C.    Chao Joins Riverside.

Later in 2010, Riverside hired Chao as a non-executive employee with the title of "Vice President."[21]   Chao had worked for Riverside during the summer before she graduated with an MBA from Columbia University.[22]  She was the third salaried employee of the Company.[23]  The terms of her employment were documented in an employment letter, which set her base salary and established her eligibility for a year-end bonus

---

Chris and I, but we knew—we both knew we needed to put together a more formal operating agreement that he could eventually sign."); *id.* 246:22–247:9 (Joyce) ("I would never challenge that Frank was not a member in the early days.").

[18] Iacono Dep. 18:4–6.

[19] *Id.* 20:19–25 (testifying that he did not participate because "I was a member of the firm; albeit with a small interest").

[20] *Id.* 58:13–21.

[21] JX-7.

[22] To be precise, "in the summer of 2010, Grace was working as an independent contractor engaged by Riverside," and was then "sub-engaged to [a company called Capital Market Risk Advisors]."  Trial Tr. 169:3–15 (Joyce); *see also* JX-6 (emails between Chao and Joyce regarding her time sheet and a related invoice showing how much Riverside owed Chao for her work); *see* Chao Dep. 15:10–23 ("From '09 to '10, I was getting my MBA, and at the same time I worked for Bronx Charter School For Excellence for a school year. And then after that I joined Riverside."); *id.* 14:22–15:6 (testifying that she obtained her MBA from Columbia).

[23] *See* Trial Tr. 170:15–171:2 (Joyce).

depending on her performance and the Company's overall financial success.[24]  Iacono testified that Chao "functionally reported to Joyce, me, and Chris" but that "she mostly assisted Joyce or Chris."[25]  Chao, like other Riverside employees, made a large part of her compensation through bonuses.[26]

### D. The Frosts And Iacono Grant Chao An Interest That They Refer To As "Equity."

As early as December 2010, the Frosts and Iacono discussed giving Chao "a small (1–2%) piece of equity."[27]  The purpose of the grant was threefold: (i) to "motivate Grace, and other employees, ultimately, to think like owners, act like owners"; (ii) to motivate Chao to "participate in the upside of [the] business"; and (iii) to provide "a retention tool to keep [Chao] at Riverside, to want to stay at Riverside, [and] to help [them] grow the company."[28]

---

[24] JX-7.  As Chao argues, Riverside paid her less than she made when she worked for Morgan Stanley.  Dkt. 138 ("Def.'s Opening Post-Trial Br.") at 26; *see also* JX-2 (showing total year to date earnings); JX-3 (bonus check for from Morgan Stanley).

[25] Iacono Dep. 27:7–15.

[26] *See, e.g.*, JX-57 (2015 Compensation Summary showing that Chao made $150,000 in base salary and $275,000 as a "cash performance bonus"); Trial Tr. 232:3–17 (Joyce) (testifying that Chao's $2.5 million in compensation over the course of her employment was "very fair[] and competitive[]" and that the Frosts "worked very hard on the bonus numbers together" and talked to "counterparts at different firms—everywhere from JP Morgan to ING to Goldman to Citi" to reach what Joyce termed "my own personal comp survey").

[27] JX-8.  In fact, Joyce stated that "I wouldn't mind AT ALL and would actually *like* to give Grace a small (1–2%) piece of equity.  Thoughts?"  *Id.* (emphasis in original).  She testified that she wanted to give her "incentive equity" or "synthetic equity."  Joyce Dep. 99:10–100:3.

[28] Trial Tr. 27:18–28:3 (Chris); *see also* Trial Tr. 177:7–19 (Joyce) (testifying that "it would be a retention device" to prevent Chao from "us[ing] our experience and then go back to

In early 2011, the Frosts and Iacono met with Chao and verbally informed her that she would receive "equity in the company."[29] The Frosts had a practice of sending employees internal memoranda that summarized their annual review and compensation.[30] Following the parties' lead, this decision refers to each of those communications as a "Compensation Summary."

In February 2011, Joyce prepared Chao's 2010 Compensation Summary, which she had discussed with Chao.[31] The summary stated that Chao would "be rewarded a 2010 performance bonus of restricted Riverside Risk Advisors LLC representing 4% equity in the company" subject to vesting."[32] The Compensation Summary described this interest

---

[Wall Street]" and "something that made her feel like an owner, like she was really part of the game").

[29] Trial Tr. 339:10–16 (Chao).

[30] *See* JX-9, JX-12, JX-39, JX-57, JX-58, JX-73, JX-74, JX-88, JX-89, and JX-149.

[31] JX-9 (2010 Compensation Summary stating that Chao, Chris, Joyce, and Iacono had discussed its terms previously on January 31, 2011).

[32] *Id.* The summary included the following language: "You will be rewarded a 2010 performance bonus of restricted Riverside Risk Advisors LLC [shares] representing 4% equity in the company. Vesting in the shares will occur as follows . . . Vesting will only occur provided, prior to the vesting dates listed above, that you do not voluntarily resign or give notice of resignation or are not terminated for "Cause" as defined in your employment letter . . . ." *Id.* It is unclear from the record whether Chao ever received a copy of JX-9. *See* Joyce Dep. at 102:23–103:7 ("Q. While we are supposedly speaking of this document, I can tell you I never received this. Are you confident that you gave this document to me? Mr. Harris: Objection to the form of the question. Q. Are you sure that you gave this document to me, Joyce? A. No, I'm not positive."). Additionally, as explained below, the Riverside Parties emphasize that the equity grant was one of "shares" and not "membership units" or an ownership designation more commonly associated with LLCs. For her part, Chao points out that the word "shares" bracketed above is missing from the above-quoted sentence in JX-9. The court is convinced the omission is a typo because the following sentence refers to "shares." *See* JX-9.

9

as "shares" and established a vesting schedule. The Compensation Summary noted Chao's "exemplary performance" and stated that she was "an important part of the growth of Riverside."[33] At least one other employee received a similar interest.[34]

The record does not reflect any discussion of the rights or details of Chao's interest between late 2010 and early 2011—for instance, whether Chao's interest was tied to employment, whether it came with voting or management rights, or whether it made her a Riverside Member under the LegalZoom Agreement. And at no point did Chao execute a consent under Section 7.2 of the LegalZoom Agreement, nor was she listed in Exhibit A (Members) of the LegalZoom Agreement.[35] Chao's name is not on Riverside's handwritten ledger, which Joyce maintained.[36]

---

[33] JX-9.

[34] *See* JX-24 (email from Yuan Zhou to Chris and Joyce asking for a discussion "regarding the equity component of my bonus in 2013"); JX-42 (email from Joyce to Chris stating that Yuan asked about "his 4% equity out loud in front of everyone . . . and I asked him to be more discreet"); JX-205 (stating the profit sharing and equity grants given to employees). Yuan eventually left Riverside and entered into separation and confidentiality agreements with Riverside, which included a buyout of his equity. *See* JX-44; *see also* Trial Tr. 71:10–71:24 (Chris) (testifying that Yuan was not "able to take his interest with him . . . after he left" and that his equity was a "profit-sharing interest" that was "of a similar character as that which Grace held or holds"). It is clear from the record that Yuan thought of his shares as falling within the Profit Sharing Plan. *See* JX-40–41 (emails from Yuan and Joyce discussing the value assigned to "the sales shares" since "the Annual PSB and all PSB shares" would be forfeited "if a Participant's employment terminates for any reason prior to the Payment Date."). Joyce testified that Yuan never took the position that his "equity" was portable. *See* Trial Tr. 226:1–7 (Joyce) (testifying that "he didn't think that [his interest was portable], and he didn't ask it").

[35] Chao Dep. at 260:17–23; *see also* Trial Tr. 454:12–17 (Chao).

[36] JX-195; *see* Joyce Dep. 61:2–70:23 (explaining the handwritten stock ledger); *see also* Trial Tr. 246:2–4 (Joyce) (saying that this ledger is "where I recorded membership interests").

On January 24, 2012, Joyce contacted a mentor to ask how he handled distributions to cover taxes on K-1 earnings.[37] Joyce noted that "Chris, Frank and I . . . really want to leave cash in the business except for the tax bill on our K-1 earnings" and also noted that "[w]e have given out Class B non voting equity,"[38] which she later testified referred to Chao's equity.[39]

In Chao's 2011 Compensation Summary, dated February 10, 2012, Joyce informed Chao that she was "currently vested in shares representing 2% ownership in Riverside" and that she would "receive a pro-rata amount of cash distribution paid to *equity owners* to help offset any tax liabilities (you may or may not have) on profits as determined on Riverside's K-1 filing."[40] The 2011 Compensation Summary also informed her that 2% more would vest on June 30, 2012, "provided that [she did] not voluntarily resign . . . or are not terminated for 'Cause' [sic] as defined in [her] employment letter."[41]

By December 2011, because he was spending less time working for Riverside, Iacono voluntarily reduced his one-third equity stake to 10% for no compensation.[42] He

---

[37] JX-11; *see also* Trial Tr. 180:5–15 (Joyce).

[38] JX-11.

[39] Joyce Dep. 106:12–19.

[40] JX-12 (emphasis added).

[41] *Id.*

[42] JX-235; Iacono Dep. 165:18–166:22 ("By the end of 2011/the beginning of 2012, I had become less active in the business. Joyce and I had a couple of conversations and we agreed that the fair thing to do, in light of my reduced level of activity in the business, would be to reduce my stake to ten percent. At that time, I thought that was the right thing to do. I didn't give any thought to whether as a legal matter I would continue to be entitled to a one-third interest in the company, notwithstanding my reduced involvement, I just agreed with Joyce and Chris to reduce my share to ten percent.").

continued to work for Riverside "on a very limited basis" and received "a very small share of the bonus pool in addition to [his] distributions."[43] He later testified that he "thought of that ten percent as founders [sic] equity" or "early partner's equity" that he "held in perpetuity regardless of whether [he] did anything actively with Riverside or not" because they "all agreed" it was a "fair piece of the company . . . for [Iacono's] efforts during those first two years or so."[44] Sometime thereafter, for regulatory reasons, Iacono agreed to reduce his equity from 10% to 9.5%.[45]

### E. Tax Documents

Starting in 2012, although she primarily received compensation through salary and bonuses,[46] Chao began to receive distributions from Riverside. These distributions were intended to cover Chao's estimated taxes arising from her equity interest.[47] The cover letters for the K-1s begin by addressing Chao with "Dear Member."[48] In an email from Joyce to the National Futures Association ("NFA"), an industry self-regulatory

---

[43] Iacono Dep. 167:8–12.

[44] *Id.* 166:23–167:7, 171:16–172:15.

[45] JX-18; JX-227 at 7.

[46] *Compare* JX-57 (2015 Compensation Summary showing that Chao made $150,000 in base salary and $275,000 as a "cash performance bonus"), *with* JX-62 (2015 Profit Sharing Plan Payments & Members' Distribution awarded Chao $4,994.52 in profit sharing and $39,956.13 for her members interest distribution).

[47] *See, e.g.*, Def.'s Opening Post-Trial Br. at 11–12 (stating that "Riverside had paid me a distribution in 2012 ($1,440) to cover my phantom income tax liability on undistributed 2011 K-1 earnings") (citing JX-22; JX-205).

[48] JX-222 (all K-1s); *see also* JX-15 (2011 K-1 and cover letter); JX-22 (2012 K-1 attached to an email); JX-65 (2015 K-1 attached to an email); JX-79 (2016 K-1 attached to an email); JX-122 at 58–63 (2017 K-1 attached to an email).

organization, Chao is identified as "Member" in the "Capital Account Ownership Levels."[49] In Riverside's 2011 tax documents, Chao is identified as a "partner" in the "capital account summary."[50]

On April 29, 2012, Chao emailed Joyce asking her to correct her name on her K-1 forms from "Grace" to "I Ching."[51] In that same email, she asked for "a copy of the partnership agreement."[52] Joyce forwarded the email to Riverside's accountant, copying Chao, and asked him to update her K-1 accordingly.[53] Nothing was done in regard to the "partnership agreement;" Chao testified that Joyce told her paperwork needed to be put in place to work out her "dual status" as "both an employee and owner of the firm."[54]

The members and employees of Riverside got "together and talked" about forming another entity "for the purpose of housing hedge fund engagements."[55] To that end, Riverside Risk Capital LLC was formed on June 27, 2012.[56] Riverside Risk Capital is owned 10% by Riverside and 90% by Joyce.[57]

---

[49] JX-19 at 642–643.

[50] JX-235 at 1213.

[51] JX-14.

[52] *Id.*

[53] JX-16.

[54] Chao Dep. 113:1–15. In 2014, Chao was given a copy of the LegalZoom Agreement. *Id.* at 128:1–129:10.

[55] Trial Tr. 344:17–24 (Chao).

[56] *See* JX-17 (Riverside Risk Capital LLC agreement).

[57] Joyce Dep. 30:19–31:5.

## F.     The Profit-Sharing Plan

In July 2014, Riverside adopted a "Profit Sharing and Sale Bonus Plan" (the "Profit-Sharing Plan").[58]

Under the Profit-Sharing Plan, a vested-profit sharing interest did not constitute a Membership Interest under either the LegalZoom Agreement or Delaware's LLC Act,[59] and it provided in part that "[e]xcept as provided below or as may otherwise be determined by the Company in its sole discretion, all Sale Shares (whether or not vested) shall be forfeited upon a Participant's termination of employment for any reason."[60]

A July 2014 Compensation Summary stated that "Riverside adopted the Riverside Risk Advisors LLC Profit Sharing and Sale Bonus Plan for the fiscal year 2014 which you will be eligible for subject to the Plan's terms and conditions."[61]  The letter stated that Chao already held four shares each of "PSB Shares" and "Sale Shares," to be increased to five

---

[58] *See* JX-30.  A year later, on July 31, 2015, Riverside adopted an amended and restated Profit Sharing and Sale Bonus Plan.  *See* JX-56.

[59] JX-30 ("[N]othing contained in the Plan shall be construed to give any Participant any rights as a member of the Company and/or any right to hold an equity interest in the Company by virtue of his/her participation in this Plan and the award of PSB Shares and Sale Shares.").

[60] JX-30; *see id.* ("Notwithstanding the foregoing, if the Participant's employment is terminated by the Company without Cause, the Company may elect, in its sole discretion, to pay the Participant the Forfeited Amount . . . under terms and conditions as determined by the Company . . . ."); *see also id.* ("[I]f a Participant's employment terminates for any reason prior to Payment Date, such Participant shall forfeit the Annual PSB and all PSB shares and shall have no right to any payments hereunder following such termination of employment.  However, the Company may elect to pay to the Participant, in its sole discretion, an amount, if any, of the Participant's forfeited Annual PSB on the Payment Date of the year of termination, subject to such terms and conditions determined by the Company.").

[61] JX-29.

over a vesting schedule.[62]  Other employees in addition to Chao received profit-sharing and sale-bonus shares.[63]

Chao noticed that these "shares ha[d] a number of material differences from a member's interest in the company, an equity interest or ownership interest."[64]  The profit-sharing pool was "more like a bonus, a discretionary bonus," with no contractual guarantee of payments, and the shares were "contingent upon employment."[65]

Two days after she received her July 2014 Compensation Summary, Chao emailed Joyce about "an important question relating to the new plan."[66]  The record indicates that Chao and Joyce spoke about "ownership" sometime over the next two weeks[67] and had "multiple conversations" about Chao's membership status.[68]  The Frosts told Chao "that [her] member's interest was actually not an equity interest," but part of the Profit-Sharing Plan.[69]

---

[62] *Id.*

[63] *See* JX-27; JX-28; *see also* JX-39 (2014 Compensation Summary for employee Yuan Zhou, including profit sharing award amount); JX-58 (2015 Compensation Summary for Steve Plake, including number of profit shares, the vesting schedule, and additional profit share incentive awards); JX-60 (2015 Profit Sharing Plan Payments Letter to Steve Plake).

[64] Trial Tr. 352:4–7 (Chao).

[65] *Id.* 352:8–353:2 (Chao).

[66] JX-32.

[67] *Id.* (emails between Joyce and Chao tentatively scheduling a discussion of Chao's interest for July 16, 2014).

[68] Chao Dep. 150:4–16.

[69] *Id.* 165:5–24, 166:7–11.

Chao took issue with this description. She believed she was a Riverside Member and that she would retain such a status even after leaving Riverside. She testified that Joyce had presented the LegalZoom Agreement to her during one of their conversations to convince her to convert her "membership" interest into a profit-sharing one.[70] Allegedly, Joyce told Chao that under the LegalZoom Agreement, Chao would receive a "tax-free distribution of [her] funds in the capital account" from converting her membership interest.[71] Chao refused.[72] Nonetheless, Chao did not ask to sign the LegalZoom Agreement as a Riverside Member because she did not think Joyce would let her.[73] Chao "thought that [she] had gotten [Riverside] to concede that [she] was an equity owner, that [she] was a member."[74] Specifically, Chao took Joyce's suggestion about converting her

---

[70] Trial Tr. 454:12–455:4 (Chao).

[71] *Id.*

[72] *Id.* 455:5–22 (Chao) (stating that she "pushed back really hard" against Joyce to preserve her membership interest).

[73] *Id.* 454:12–17 (Chao).

[74] *Id.* 454:12–455:22 (Chao) ("Q. At that time, however, you didn't ask if you could sign the LegalZoom agreement, did you? A. I couldn't, because—Joyce's position at that time to me was that I was not an equity owner. She was trying to tell me that I was a profit-sharing participant. And then, later, there was a bunch of discussion around that. I pushed back. And then she showed me the LegalZoom agreement [and told Chao she] would get tax-free distribution of [her] funds in the capital account. . . . But at that point in time, she—really did not want me to be a member. . . . [S]he also said in your own filings . . . that I couldn't sign it. I don't recall that specifically. It's possible. . . . I thought that I had gotten [Riverside] to concede that I was an equity owner, that I was a member."); *id.* at 456:16–457:1 (Chao) ("Q. But [the issue of Chao's status] was never resolved. Right? A. She gave me member distributions that year, and I continued to get my K-1s. . . . Q. You weren't permitted to—your testimony is that you weren't permitted to sign the operating agreement for the company. Is that right? A. Because a new one was coming along.").

16

membership interest as a tacit concession that she possessed a membership interest to convert.[75]

Joyce testified that she was adamant that Chao was not a Riverside Member and that Chao could not retain her interest after leaving the company. According to Joyce, when Chao insisted that she was a member, Joyce offered to compensate her in the same manner as the other members—through biannual payments—and that Chao would be responsible for paying taxes, including estimated taxes, every quarter.[76] Joyce testified that Chao did not want that arrangement, so Joyce "didn't push it too hard" "because that really wasn't part of what the deal was or the plan was."[77]

During the same period, Iacono further decreased his involvement with Riverside. On August 3, 2014, Iacono emailed Joyce a proposal for Riverside to buy 8.5% of his 9.5% interest in the Company for $200,000.[78] Riverside ultimately purchased the 8.5% for

---

[75] Chao. Dep. 132:19–24 ("During the course of these conversations, then, back and forth, they produced the operating agreement to me. And they produced the operating agreement to me because, at that point, they conceded that I was a member, but they wanted me to convert my member's interest into a profit-sharing interest.").

[76] Trial Tr. 211:5–211:21 (Joyce).

[77] *Id.* 211:5–212:22 (Joyce).

[78] JX-34. Specifically, Iacono asked for an agreement where Riverside would refer "expert witness / litigation support / mediation inquiries" to his company, South Haven, for a finder's fee in exchange for him referring "all swap advisory work . . . to Riverside for the same finder's fee." *Id.* He also wanted to be listed on Riverside's website as an "advisor" or "some similar title" and noted that there were a few things missing in his attribution of work performed as contained in a spreadsheet. *Id.*

$175,000.[79] By the end of 2014, Iacono held about 1% of equity in Riverside through South Haven and testified that he was "completely inactive" in Riverside's business.[80]

## G. The 2015 LLC Agreement

By 2015, the Frosts and Chao had not solidified the nature of Chao's interest in Riverside. In the beginning of 2015, however, the Frosts "offered [Chao] . . . a path to membership."[81] The Frosts told Chao that they had decided to adopt a new LLC agreement, and that she could either become a "non-managing member" if she "agree[d] to the terms" of the 2015 LLC Agreement, or she could "continue under the shares that [she] received in 2011, which was memorialized by the [profit sharing] plan documents in 2014."[82] Joyce testified that the Frosts made it "very clear" to Chao "sometime between 2014 and the end of 2015 that her interests were going to be governed under the governance documents," namely, either "the profit-sharing plan or the 2015 operating agreement."[83]

---

[79] *See* JX-35 (email from Joyce to Riverside's accountant informing him that "Riverside will be 'retiring'/buying back 8.5% of Franks [sic] interests" and asking for tax advice on how to structure the transaction); JX-218 at 1, 3 (bank statement including the $175,000 wire transfer); JX-227 at 7 ("On September 4, 2014, South Haven further reduced its interests to 1% and transferred 8.50% to the Frosts for $175,000 in consideration.").

[80] Iacono Dep. 87:10–13.

[81] Joyce Dep. 222:18–24.

[82] *Id.* 222:18–223:6; Trial Tr. 452:6–17 (Chao) (testifying that Joyce forwarded her a draft operating agreement and "invited [her] to sign" it).

[83] Trial Tr. 200:14–201:3 (Joyce); *see also id.* 454:12–19 (Chao) ("Joyce's position at the time to me was that I was not an equity owner. She was trying to tell me that I was a profit-sharing plan participant. And then, later, there was a bunch of discussion around that. I pushed back.").

Chao recalled that she "immediately knew there were really major issues" with the 2015 LLC Agreement, such as the separation of members into two classes (managing members and non-managing members), the elimination of fiduciary duties, limited books and records access, and the non-perpetual nature of the non-managing members' equity interest.[84]

On January 15, 2015, Chao emailed Joyce saying in part:

> In advance of the sit down we need to have when I return, I would like to confirm that the new operating agreement you referred to last night will reflect the true nature of the equity that I had been awarded several years ago, that is, a bona fide ownership stake that belongs to me even were I to leave Riverside. As we discussed this summer, this is different from the "equity" of the profit-sharing plan that was put in place this summer. I have no reason or desire to convert the equity that I had been awarded into this form as my equity is obviously more valuable than the profit-sharing plan "equity". Please confirm that any new corporate documentation will not lead to a change to the nature of my equity.[85]

Joyce responded by saying: "I understand your position and we can discuss this week."[86] As they discussed, Chao was "very insistent that [she was] a member" of Riverside.[87] Chris testified that "there were lots of meetings between Joyce and [Chao] trying to figure out a way forward."[88]

---

[84] *Id.* 362:9–363:8 (Chao).

[85] JX-38.

[86] *Id.*

[87] Joyce Dep. 223:11–12.

[88] Trial Tr. 37:10–12 (Chris).

19

The already weakened relationship between Joyce and Chao began to further decline in March 2015. Joyce remarked to Chris that Chao was being "completely insubordinate" on a certain day;[89] Chao indeed took a disrespectful tone toward Joyce in emails.[90]

On March 3, 2015, Joyce emailed Chris an article about "synthetic equity," searching for a term to capture what they thought they had awarded Chao.[91]

On March 20, 2015, Joyce emailed Chao and Iacono the proposed new operating agreement for Riverside, which the Frosts had signed as "Managing Members," and which had signature lines for South Haven and Chao to execute as "Non-Managing Members."[92] A month later, when Joyce asked Chao if she had reviewed the 2015 LLC Agreement, Chao responded that "there are[,] as I pointed out before[,] big picture issues that need to be resolved."[93] She ultimately refused to sign it.[94]

After receiving her 2014 K-1, Chao noticed that the "[p]artner's share of profit, loss, and capital" section of the form contained the word "various" instead of numerical

---

[89] JX-42.

[90] JX-45.

[91] JX-43.

[92] JX-48; JX-46; *see* 2015 LLC Agreement.

[93] JX-49.

[94] Chao Dep. 143:14–144:4 ("Q. And were you given an opportunity to sign on to the 2015 Operating Agreement? A. Yes. . . . Joyce gave me a copy of the document and said that I could sign it. Q. Okay. And—and did you do that? A. No. Q. Why not? A. Because that operating agreement took away many of the rights that I had as a member of Riverside.").

figures.[95] On July 9, 2015, Chao emailed Joyce asking why, and Joyce responded by saying that "[w]e put your income allocation of 4% from the Profit Sharing and Sales Plan . . . as part of your K-1 distributions and subtracted out the amounts you were paid under the PSSP to get net income," noting that "the 'various' is more for accounting and Chris and mine both say the same."[96] She stated that she was "double checking with our accountant" and also remarked that she "would like to get the Operating Agreement signed by next week."[97]

In response, Chao asked Joyce to "walk [her] through the math of the figures on the form" and expressed confusion "why they were actual numbers in the past, but now aren't."[98] She also stated "[w]ith respect to the operating agreement – as I mentioned previously, there are some issues that we need to work through before I can sign it. Please let me know when you'd like to discuss."[99] Joyce then put Chao in touch with Riverside's accountant directly.[100] Chao met with Riverside's accountants at Cohn Reznick LLP, after which they emailed Chao, copying Joyce, a "worksheet showing [her] capital balance" of 4% in Riverside.[101]

---

[95] JX-222 at 25; *see also* JX-50 (email from Chao to Joyce asking "[w]hy are the P&L and Capital % now listed as 'various'?").

[96] JX-51.

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.* at 5; JX-54 at 1.

On July 15, 2015, Chao emailed the 2015 LLC Agreement to her brother, Kwei Chao, who was in law school at the time.[102] He identified several things that he viewed as "highly unfavorable," such as the breadth of the non-compete and "membership expulsion" for non-managing members no longer at Riverside.[103]

Chao's 2015 Compensation Summary, dated December 23, 2015, indicates that effective January 1, her salary would increase and she would be promoted to "Managing Director."[104] Importantly, among other things, the letter also stated that "Riverside adopted the Riverside Risk Advisors LLC Profit Sharing and Sale Bonus Plan for the fiscal year 2015 and as of December 31, 2015 you will have vested 4.5% in PSB and Sale Shares (*assuming you are no longer a Member of Riverside Risk Advisors, LLC*)."[105]

Later communications suggest that any membership interest was perceived as distinct from the Profit-Sharing Plan. In March of 2016, Chao received a "2015 Profit Sharing Plan Payments & Members' Distributions" form, indicating a "vested interest" in both a 0.5% "profit sharing & sale bonus plan" *and* a separate 4% "Members Interest

---

[102] JX-52; *see* Trial Tr. 366:12–19 (testifying that her brother "was going to law school at the time"). Riverside argues that Chao breached confidentiality by sharing the 2015 LLC Agreement with her brother. *See* Dkt. 137 ("Pl. and Third-Party Defs.' Opening Post-Trial Br.") at 16–17 ("Mr. Chao's advice to his sister was informed by his review of the 2015 Operating Agreement, which Grace provided to him without the Frosts' knowledge or consent, in violation of the Riverside's confidentiality policy.") (Citing Trial Tr. 461:7–463:15 (Chao)).

[103] JX-52.

[104] JX-57.

[105] *Id.* (emphasis added).

22

Distribution."[106]  The following month, Chao emailed Joyce asking "when will the profit

distributions from last year be made[?]" and "[w]hen will our K-1s be ready?"[107]  As for

the K-1s, Joyce responded by saying their accountant had all the necessary paperwork "and

should be done hopefully in the next few days."[108]  And as for the profit distributions, Joyce

observed that "[y]ou received your [0].5% that you just vested in for the Profit Sharing

Plan but we haven't made any distribution for members interest yet."[109]

## H.  Riverside Offers To Buy Chao's Interest.

Sometime before April 17, 2016, Chao and the Frosts began discussing a potential

buyout of Chao's interest—whatever it was.[110]

Around the same time, Chao began asking the Frosts how Riverside determined

compensation.  An email chain shows that, on April 22, 2016, Joyce asked Chao to identify

"the type of clarity you are looking for as we discussed this week," noting that "Chris and

I would find it very helpful in furthering our discussions."[111]  She ended by stating that

Chao was "a very valuable member of the team at Riverside, which we have communicated

and demonstrated through compensation, responsibility and title, so we would really like

---

[106] JX-61; JX-62.

[107] JX-63.

[108] *Id.*

[109] *Id.*  A similar conversation occurred the following year.  *See* JX-77; JX-78.

[110] *See, e.g.*, JX-64 (emails between Joyce and Chao about K-1 taxes in which Joyce stated she wanted "to come to a conclusion" on the "buyout").

[111] JX-66.

to move forward and address your concerns."[112] Chao responded by saying she wanted clarity "with respect to contribution and compensation determination," specifically "how values are assigned and revenues allocated to the different aspects of our work."[113]

The buyout talks for Chao's interest in Riverside continued. On May 6, 2016, Joyce (copying Chris) emailed Chao a spreadsheet valuing her interest at $167,379.[114] A week later, Chris (copying Joyce) sent an email to Chao (the "May 2016 Email"):

> Please let us know by Monday if you accept our offer to buy 4% of your interests in Riverside. As you know, we have spent a lot of time and thought on the valuation and believe the offer is very fair and reasonable. We are not selling the company. Therefore, valuing projected cash flows associated with your allocated profit of 4% . . . over a five year period and discounting them at a risky rate is very reasonable. . . .
>
> *If you do not accept our offer, you will remain as a member under our current Operating Agreement.* Also, we would be very open if Steve [another employee] would be interested in purchasing your interests assuming he accepts the price you are asking.[115]

Chao did not accept the offer, nor did she respond with a dollar-based counteroffer.

The italicized language from the May 2016 Email engendered a misunderstanding between the Frosts and Chao. To the Frosts, the phrase "current Operating Agreement" meant the 2015 LLC Agreement, as it had been signed a year prior to the email and they

---

[112] *Id.*

[113] *Id.*

[114] JX-67.

[115] JX-68 (emphasis added).

assumed it was operative.[116]  Under the 2015 LLC Agreement, Chao would be considered

a non-managing member and—the Frosts believed—would not be entitled to retain her

Membership Interest after leaving Riverside.[117]  To Chao, the phrase "current Operating

Agreement" meant the LegalZoom Agreement, as she believed the 2015 LLC Agreement

was not in place because she had refused to sign it.[118]  Under the LegalZoom Agreement,

---

[116] Trial Tr. 41:23–42:8 (Chris) ("Q.  And just to add some context, in the paragraph above, the first sentence reads, 'If you do not accept our offer, you will remain as a member under our current Operating Agreement.'  Do you see that?  A.  Yes, I do.  Q.  And your reference to 'current Operating Agreement,' is that the 2015 operating agreement that we looked at a little earlier?  A.  Yes."); *id.* 36:23–38:9 (describing how the parties were at an impasse and trying to "figure out a way forward"); *id.* 200:4–13 (Joyce) ("Q.  The first sentence in that paragraph states in full, 'If you do not accept our offer, you will remain as a member under our current Operating Agreement.'  Do you see that?  A.  Yes.  Q.  What was the current operating agreement then in place?  A.  Well, this was 2016.  So it was clearly the 2015 operating agreement."); Chris Dep. 39:21–41:16 (testifying that the Frosts were referring to "the operating agreement from 2015"); Joyce Dep. 314:13–316:16 (testifying that because Chao rejected the Frosts' offer to buy her interest and "wanted to become a member under [her] own rules," "[w]e followed the rules and terms under the [2015 LLC Agreement] and applied them to [her] as if [she] were a member").  That Chao had not signed it does not mean the Frosts could not have reasonably thought the 2015 LLC Agreement governed, as they thought Chao had a profit sharing interest.

[117] Section 4.9(c) of the 2015 LLC Agreement gives the Managing Members to "expel any Non-Managing Member that is providing services to the Company or its Affiliates from the Company at such time as such Non-Managing Member ceases to provide services to the Company" or to "expel any member immediately from the Company for Cause." Presumably, the Frosts' power as Managing Members to act under Section 4.9(c) precipitated their belief that Chao's interest under the 2015 LLC Agreement could be terminated upon Chao's departure from Riverside.

[118] *See* Dkt. 143 ("Def.'s Answering Post-Trial Br.") at 30 ("As JX 68 shows, Chris stated that 'If you do not accept our offer, you will remain as a member under our current Operating Agreement.'  He did not say '2015 Operating Agreement,' and 'current Operating Agreement' could not be the 2015 Operating Agreement because it had inequitable terms and I refused to sign it."); Trial Tr. 372:22–373:10 (Chao) ("Now, in my mind, this could never refer to the 2015 operating agreement because I explicitly declined to sign it. . . .  So in my mind, the only operating agreement that could be referred to here,

Chao would be considered a Member and would retain her Membership Interest post-employment with Riverside. Each side therefore believed that the other had acquiesced to its position.

After the May 2016 Email, the Frosts began treating Chao as a "non-managing member" under the 2015 LLC Agreement. Chao, on the other hand, interpreted references to her Membership Interest as a recognition that she was, indeed, a Riverside Member under the LegalZoom Agreement. These opposing viewpoints were not litigation constructs, but rather, each party's genuine belief from 2016 onward.[119]

Chao's 2016 Compensation Summary, dated January 27, 2017, stated that she had "vested 5% in PSB and Sale Shares" and contained the same language qualifying the vesting: "assuming you are no longer a Member of Riverside Risk Advisors, LLC."[120] So

---

would be the one that's already in effect at the time that I became a member, which would be the LegalZoom agreement. . . .").

[119] In her post-trial briefing, Chao rejects the Frosts' position that Chao's interest was governed by the 2015 LLC Agreement. *See* Def.'s Opening Post-Trial Br. at 18 ("[I]t doesn't take decades of experience closing business deals and signing contracts to know that a person can't be bound by an agreement she never agreed to, and the Frosts had decades of experience."). Chao further rejects the Frosts' alternative proposal—that her interests were governed by the Profit-Sharing Plan—because bonuses under that plan are "essentially a form of discretionary bonus" and "not the profit sharing which I had been promised, which is a right to the profits of the firm." Def.'s Opening Post-Trial Br. at 20. As to the first point, the Frosts reasonably believed that Chao never became a Member under the LegalZoom Agreement and that they were offering her the chance to become a Non-managing Member under the 2015 LLC Agreement or continue under the Profit-Sharing Agreement (as they believed the grant was a profit share). When Chao continued to cash her member distribution checks, the Frosts believed that Chao had acquiesced to being governed under the 2015 LLC Agreement. Chao's second point is unpersuasive because it assumes the very issue in dispute—that Chao had been promised a perpetual right to the profits of the firm.

[120] JX-74.

did Chao's letter for 2017.[121]   Chris testified that "starting in 2016," Chao received compensation in the form of salary, a bonus, profit sharing payments, *and* "member distributions under the [2015 LLC Agreement]."[122]

Beginning at least as early as 2018, the Frosts conducted "Performance Appraisals" in addition to Compensation Summaries.[123]   In Chao's Performance Appraisal for 2017, dated January 16, 2018, the Frosts gave Chao relatively low ratings.[124]   The appraisal noted that Chao had "the knowledge and experience to be a productive member of our team," but it stated that her "overall productivity . . . has been reduced to working almost exclusively with Chris" because she had "not developed positive working relationships with others" and "display[ed] resistance to guidance and advice from more experienced members of the team."[125]   Chao's relationship with Joyce, in particular, had grown tense.[126]   Chao signed and returned her annual performance review with comments asking for clarification as to

---

[121] JX-89.

[122] Trial Tr. 104:7–16 (Chris).

[123] *See* Trial Tr. 45:12–46:7 (Chris) (describing Riverside's performance appraisal process).  The record does not indicate that any Performance Appraisals were undertaken prior to 2018.

[124] *See* JX-90 (giving Chao mostly scores of 2 and 3 out of 5 on various items relating to her "Competency Assessment").

[125] *Id.*

[126] *See, e.g.*, JX-92 (email conversation between Chao and Joyce); JX-99 (emails from Joyce and Chao, as well as from Joyce and Chris calling Chao's comments "unprofe[ss]ional and frankly insubordinate"); JX-100 (emails between Chao and Chris where Chao took exception to other Riverside employees "leverag[ing] [her] work," with Chris replying that no one "pass[ed] off your work as theirs and the insinuation that someone did that is very disappointing" and Chao afterwards asking him to "review all the emails between Joyce and myself on this, as well as compare the two models . . . as an impartial third party").

her business development role, and she stated regarding "working relationships" that she had "been transparent about the difficult experiences [she] had working with certain team members" when she was "not given proper credit for [her] work," and so she had shifted her focus to projects where she believed she would be more fairly treated.[127]

In early 2018, Joyce asked Chao to reassign certain Riverside client business to Riverside Risk Capital to consolidate accounting engagements and valuation services to one entity.[128]  The Frosts appeared to treat Riverside Risk Capital as within the general Riverside business and gave bonuses for revenues across both entities.[129]

---

[127] JX-104.

[128] Joyce Dep. 325:22–326:6; *see also* Chris Dep. 201:24–202:14 ("Q.  Okay.  And how do you decide which transactions are Riverside Risk Advisors versus Riverside Risk Capital?  A.  Based on—well, more the equity derivatives advisory business goes into Risk Capital, and the hedge accounting advisory goes into Riverside Risk Capital.  Q.  So equity derivatives and hedge accounting goes into Riverside Risk Capital, and everything else goes into Risk Advisors, is that—A.  There might be something else that I'm not thinking of that goes into Risk Capital, but I think those two are the primary revenue sources."); JX 85 (email from Chao to a client saying "[g]oing forward, we would like to invoice all accounting and valuation services out of Riverside Risk Capital" and that "[a]ny new accounting and/or valuation engagements will fall under RRC as well"); JX-91 (email from Joyce attaching an "Assignment Agreement from Riverside to RRC"); JX-97 (assignment of engagement letter for Vivint Solar, Inc. from Riverside to Riverside Risk Capital).

[129] *See, e.g.*, Trial Tr. 118:19–120:5 ("Q.  During your deposition, I asked you about Riverside Risk Advisors' and Riverside Risk Capital's projected revenues for 2021 . . . and you estimate that revenues was going to be—probably going to be 10 ½ to 11 million for both entities combined.  Is that correct? . . .  A.  Yes, I remember estimating our year-end revenues as being about that. . . .  Q.  Do you calculate separate bonus pools and profit-sharing pools for each entity?  A.  No.  Q.  So employees at Riverside don't get a bonus for Riverside Risk Advisors and a bonus for Riverside Risk Capital; they just get one bonus?  Is that correct?  A.  That's correct, yeah.  Q.  And the same thing for profit-sharing[?] . . .  A.  The profit-sharing pool—the bonus pool is based on total revenue for the year for Riverside Risk Advisors and Riverside Risk Capital. . . .  But bonuses are paid based on both together, annual bonuses.").

On March 16, 2018, Chao received a 2017 Profit-Sharing Plan distributions letter differentiating between her "members interest distribution" and her "vested interest in profit sharing & sale bonus plan."[130] It also indicated that "the distribution will be paid separately" from the "profit sharing allocation,"[131] and it was.[132]

Around the same time, the Frosts were finalizing negotiations of a side letter to the 2015 LLC Agreement with Iacono.[133] On April 4, 2018, the Frosts and Iacono's company South Haven entered into a side agreement in connection with its execution of the 2015 LLC Agreement. The Frosts signed as "Managing Members" of Riverside, and Iacono signed on behalf of South Haven, a "Member."[134]

## I.    Tax Questions And Books And Records Requests

In April 2018, a tax question turned into a request for books and records. Riverside switched accountants sometime around November 2017.[135] Chao's accountant emailed her asking her to double check with Riverside that the K-1 they sent her was accurate.[136] Joyce

---

[130] JX-106.

[131] *Id.*

[132] *See* JX-109 (TriBet earnings statement showing a discretionary profit share bonus of $10,662, corresponding with the profit share amount); JX-110 (check for $42,646, the membership distribution amount).

[133] *See, e.g.*, JX-59 (email from Iacono to Joyce stating he wanted "to get that letter done this week if possible"); JX-108 (email from Iacono to Joyce including a side letter to the 2015 LLC Agreement); Joyce Dep. 327:11–25 (identifying a side letter to the 2015 LLC Agreement between Iacono and the Frosts as managing members of Riverside that "modif[ied] the terms" of the agreement).

[134] JX-198.

[135] *See* JX-81.

[136] JX-114.

forwarded the question to Riverside's new accountant and told Chao "[h]e may have a different approach."[137] After hearing back from Riverside's accountant, Joyce forwarded the response to Chao, who asked Joyce to check with the accountant "why he took a different approach" and stated that she "would like to see Riverside's complete financials for 2017."[138]

The next day, Joyce replied, asking "[a]re you free now to discuss the taxes?"[139] About half an hour later, Chao emailed Joyce saying "[a]s discussed, I am formally requesting access to Riverside's books and records as an owner of the firm."[140] A few days later, Joyce responded with a memorandum stating in full:

> During our discussion on April 30, 2018, you requested to see the complete financials of Riverside Risk Advisors . . . as you were concerned about the financial health of Riverside, wanted to know how we were doing and noted that your distributions were increasingly a more important part of your annual compensation.
>
> I noted that Riverside is doing fine as evidenced by the amount of profit sharing we were able to provide to both members and participants under Riverside's Profit Sharing and Sales, a plan in which you are also entitled to receive payments. I also noted that we pay performance bonuses. The bonuses are awarded at our discretion and are in addition to our employees' base salaries. I told you we have been "lucky" to be able to pay out somewhere between 60-70% of our revenues in compensation over the years.
>
> You asked for additional details since "65% is high compared to other advisors". I responded that we are a very small firm

---

[137] *Id.*

[138] JX-117; *see also* JX-115.

[139] JX-117.

[140] JX-119.

with seven employees and by disclosing the details of our financial statements, specifically expenses, it would be very apparent and not too difficult to determine the approximate compensation levels of Riverside employees (of course, especially its highest performers, Steve Plake, Chris and me). This is highly sensitive information, especially given the history between you and Steve, and I firmly believe that disclosing the detailed information about our expenses would be very harmful to Riverside.

On April 30th, I received an email from you "formally requesting access to Riverside's books and records as an owner of the firm". Under the Operating Agreement, we have no obligation to provide our books and records to you as I stated in our meeting. Nevertheless, to address your concerns about our financial health, I'm happy to disclose that our 2017 revenues as reported on our tax returns was ~$5.7 million (you can easily calculate the total expenses based on your K-1s). I'm also willing to disclose that on 12/31/2017 we had a total of $1.3 million in cash in our bank accounts (as I mentioned, we distributed a bit over ~$1 million based on each recipient's relative distribution amounts). Please be fully confident that we ended last year on a positive note. Also, this information is highly confidential and we trust that you will keep it as such as per the confidentiality terms of your Riverside agreements.

I trust this addresses the concern you expressed in our meeting.[141]

About two weeks later, counsel for Chao wrote a letter to Joyce, asking that she "reconsider [her] response."[142] Her counsel stated that Chao had the right to inspect Riverside's books under Section 5.1 of the LegalZoom Agreement and under Delaware law. Her counsel observed:

I am aware of a subsequent operating agreement with significantly more limited access rights. However, I note that the initial Operating Agreement is not subject to modification

---

[141] *Id.* at 7.

[142] JX-122.

31

or termination except by unanimous vote of the members. Ms. Chao was never given an opportunity to vote with regard to the adoption of that agreement.[143]

Thus, the letter concluded, "Ms. Chao's rights and obligations are defined by the Operating Agreement in effect at the time of her acquisition of her membership interest."[144] The letter asked Joyce to contact counsel to arrange an inspection or to discuss further.

A week later, Joyce emailed Chao's counsel. Joyce stated:

> Andrew – In response to your letter dated May 18, 2018, we are happy to allow you and Grace to inspect Riverside's income statement and balance sheet at our office next week, upon one business day notice, for the purpose of allowing Grace to access Riverside's financial health as she expressed concern during our meeting on April 30th. *Although Riverside's Operating Agreement does not provide for such disclosure, we want to make sure that as a member of Riverside Risk Advisors LLC, Grace has the information she needs to make such an assessment.*
>
> Please remind Grace that this information is highly confidential and that she is bound by the strict confidentiality terms of her offer letter dated October 4, 2010.[145]

These communications further strained Chao's relationship with the Frosts.[146] Chris testified at trial that he initially "thought we could turn the situation around" and

---

[143] *Id.*

[144] *Id.*

[145] JX-125 (emphasis added).

[146] That said, Chao continued to refer prospective clients to Riverside even after the dispute turned into a legal battle. *See, e.g.*, JX-189 (text messages from Chao and a prospective Riverside client); JXs-138–39 (email from Chao to Chris referring a potential client looking for hedging support).

"advocated for Grace the most," but that Chao became "super argumentative," disrespectful toward Joyce, and "more and more checked out."[147]

About a month later, on June 29, 2018, Chao demanded to inspect Riverside's books and records. On July 12, 2018, her counsel wrote to Riverside's counsel that "the Company has not complied with its full obligations to provide minority member, Chao, with the complete and proper books of account" and that the documents provided were "woefully deficient."[148] Chao's counsel requested additional records. In the same letter, counsel asked for further details regarding Riverside Risk Capital.[149]

---

[147] Trial Tr. 59:2–21 (Chris); *see also* JX-126 (May 2019 email from Chris to Chao congratulating her on obtaining an engagement letter but asking her to "let us know when we have a new client," stating that Chao had "arranged a solo call with [a client] despite being reminded by Joyce [the] night before to include [him], Joyce or Steve on prospect calls," and to "please stop disregarding what we ask you to do" as "it's in the best interests of Riverside and our clients to work together as a team").

[148] JX-130.

[149] *Id.*

## J. Chao's Termination And The Aftermath

On July 13, 2018, Chris terminated Chao's employment at Riverside.[150] Chao was not surprised.[151] After negotiations, Riverside offered her $150,000 "for the value of [her] Non-Managing Member's Interest in Riverside" and an additional $50,000 of separation pay in a Confidential Separation Agreement and Mutual Release.[152] Chao did not sign it.

On December 2, 2018, Iacono sent the signed 2015 LLC Agreement to Joyce.[153] A few months later, Joyce emailed Iacono with an "updated Exhibit A to the Operating Agreement reflecting the pro-rata reallocation of Chao's member interest to the other members," given Chao's termination.[154]

During this time, the Frosts were in compensation talks with other employees. In January 2019, the Frosts and Steve Plake discussed the possibility of Plake "joining the Operating Agreement as a managing member or something between joining the OA as a managing member and participant in the [profit sharing] program" and increasing his profit

---

[150] Dkt. 131 (Confidential Separation Agreement and Mutual Release between Chao and Riverside). The parties dispute whether Chao was terminated "for cause." *See, e.g.*, Def.'s Opening Post-Trial Br. at 29–33. That fact is irrelevant to the decision. The Riverside Parties moved to strike Annex A to Chao's Opening Post-Trial Brief, which refutes the contention that the was terminated "for cause," and Exhibit A, which includes some emails not admitted into evidence at trial. Neither Annex A nor Exhibit A influence the court's decision herein, as they are both irrelevant to its outcome. To the extent the motion to strike needs a resolution, it is denied.

[151] *See, e.g.*, Trial Tr. 482:18–483:1 (Chao) ("[H]onestly, I would say I wouldn't say I was surprised, because I assumed that there would be a good chance of that happening once I asked for the books and records.").

[152] JX-131; JX-133.

[153] JX-137.

[154] JX-135; JX-147.

sharing "equity."[155] Talks continued into 2020, and an agreement was reached in June of that year.[156] On March 15, 2019, Riverside promoted another employee to "Director," Chao's former position, and awarded her four shares in Riverside's Profit-Sharing Plan.[157]

On March 19, 2019, Riverside sent Chao her 2018 K-1 along with a letter that stated that her "member interest is deemed terminated as of August 16, 2018 in accordance to [sic] Section 4.9(c) of Riverside's Operating Agreement dated March, [sic] 2015."[158]

On April 26, 2019, Chao emailed the Frosts, claiming that her 2018 K-1 and accompanying letter "contain significant mistakes," including that she received over $83,000 of withdrawals and distributions and that her member interest "is deemed terminated . . . in accordance to Section 4.9(c) of [the 2015 LLC Agreement]."[159] Chao did not dispute that the letter was a valid exercise of the Frosts authority under Section 4.9(c) of the 2015 LLC Agreement. Rather, she argued out that she was not bound by the 2015 LLC Agreement.[160] She asserted that the LegalZoom Agreement still controlled, "under which majority members have no right to unilaterally terminate a minority member's interest," thus she "continue[s] to be an owner of the firm."[161] She asked for the mistakes to be corrected, a date when she would receive her member distribution for 2018,

---

[155] JX-141; *see also* JX-143 (email chain continuing the talks).

[156] *See* JX-169; JX-170; JX-171; JX-175; JX-176; JX-177; JX-178.

[157] JX-144; JX-145.

[158] JX-148.

[159] JX-152.

[160] *Id.*

[161] *Id.*

and "Riverside's 2018 full year financials, the firm's 2018 tax return, as well as the items I requested last summer but still have not received."[162]

A week later, having received no response, Chao threatened to report the issue to the IRS if she did not hear back.[163] Two days later, Chao received a letter from Riverside's counsel "to correct the misstatements and misconceptions . . . concerning your former interest in the Company."[164] That letter stated that, even assuming that the LegalZoom Agreement was operative, Chao would not be a member under that agreement for various reasons. It described the "non-member interest assigned" to Chao as "a synthetic equity interest, consistent with industry-wide employee incentive programs" and "a precursor to the profit sharing plan formally adopted by the Company for all employees in 2014."[165] The letter also said, "[i]t is no coincidence that in that same year, you inquired of Joyce whether upon leaving the Company's employ you would retain your non-member interest in the Company. She told you that you would not retain the interest."[166] The letter stated that the Riverside Members had adopted the 2015 LLC Agreement, that Chao had been offered the opportunity to become a non-managing member or increase her participation in the Profit-Sharing Plan commensurate with the closing out of her synthetic equity, and that she had declined to do both.[167] Thus, the letter stated, her non-member interest

---

[162] *Id.*

[163] *Id.*

[164] JX-153.

[165] *Id.*

[166] *Id.*

[167] *Id.*

terminated under Section 4.9(c) of the 2015 LLC Agreement, the K-1 she was sent was correct, and she had no right to inspect Riverside's books and records.[168]

### K. This Litigation

Riverside filed suit on October 1, 2019, seeking declaratory judgment that Chao is not a Riverside Member and "does not otherwise hold a membership [interest] in the Company under the LegalZoom Agreement, the LLC Act or the 2015 Operating Agreement."[169] Chao, acting *pro se*, filed an answer and verified counterclaim on November 8, 2019, bringing claims against the Riverside Parties for breach of contract, unjust enrichment, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and promissory estoppel.[170]

The court held a three-day trial beginning February 8, 2022.[171] The parties filed post-trial briefing,[172] and the Court held post-trial oral argument on June 1, 2022.[173] The parties submitted the Joint Schedule of Evidence on July 11, 2022.[174]

## II. LEGAL ANALYSIS

"In governance disputes among constituencies in an LLC, the starting (and end) point almost always is the parties' bargained-for operating agreement, and the court's role

---

[168] *Id.*

[169] Dkt. 1 (Compl.) ¶ 60; *see also id.* at 18–19.

[170] Dkt. 6.

[171] Dkts. 129–31.

[172] Dkts. 134–40, 142.

[173] Dkt. 39 (Am. Verified Countercl.) ¶¶ 59–66.

[174] Dkt. 154.

in these disputes is to interpret the contract and effectuate the parties' intent."[175]  Thus, this analysis begins by considering whether, under the LegalZoom Agreement, Chao is a Riverside Member, which she is not.  The analysis then turns to the question of which LLC agreement governs Riverside, holding that the 2015 LLC Agreement is the operative agreement.  Finally, the decision considers Chao's five counterclaims, which arise out of both contract and equity.  Because Chao does not meet her burden as to any of the counterclaims, the analysis does not reach the Riverside Parties' defenses to those counterclaims.

### A.      Under The LegalZoom Agreement And The LLC Act, Chao Is Not A Riverside Member.

Chao claims that she is a Riverside Member and that the LegalZoom Agreement governs her relationship with Riverside.  The Riverside Parties argue that Chao was never admitted as a Riverside Member under the LegalZoom Agreement or otherwise.

Under the LLC Act, a "member" is "a person who is admitted to a limited liability company as a member as provided in § 18-301."[176]  Section 18-301(b) governs LLC membership admission after the formation of a limited liability company.

---

[175] *A&J Cap., Inc. v. Law Office of Krug*, 2018 WL 3471562, at *5 (Del. Ch. July 18, 2018) (cleaned up); *see also* 2 R. Franklin Balotti et al., *Delaware Law of Corporations and Business Organizations* § 20.4 (4th ed. 2022-2 Supp.) ("Once members exercise their contractual freedom in their limited liability company agreement, they can be virtually certain that the agreement will be enforced in accordance with its terms."); 54 Paul M. Coltoff, C.J.S. *Limited Liability Companies* § 18 (May 2022 Update) ("The operating agreement must be enforced according to its terms.").

[176] 6 *Del. C.* § 18-101(13); *see also Robinson v. Darbeau*, 2021 WL 776226, at *8 (Del. Ch. Mar. 1, 2021) ("To attain the status of a member of a Delaware limited liability

At the relevant time, Section 18-301(b) stated:

> (b) After the formation of a limited liability company, a person is admitted as a member of the limited liability company:
>
> (1) In the case of a person who is not an assignee of a limited liability company interest . . . at the time provided in and upon compliance with the limited liability company agreement . . . .
>
> (2) In the case of an assignee of a limited liability company interest, as provided in § 18-704(a) of this title and at the time provided in and upon compliance with the limited liability company agreement . . . [.]¹⁷⁷

At the relevant time, Section 18-704(a) stated:

> (a) An assignee of a limited liability company interest may become a member:
>
> (1) As provided in the limited liability company agreement; or

---

company under the LLC Act, admission is necessary.") (alterations, citation, and internal quotation marks omitted).

[177] 6 *Del. C.* § 18-301(b); 2020 Del. Laws Ch. 259 (H.B. 344); *see also* 4 Robert S. Saunders et al., *Folk on the Delaware General Corporation Law* § 18-301.03[A] (6th ed. 2021-3 Supp.) ("Section 18-301(b)(1) provides that a person who is not an assignee of a limited liability company interest . . . *is admitted as a member of the limited liability company at the time provided in and upon compliance with the limited liability company agreement* or, if the limited liability company agreement is silent, upon the consent of all members and when the person's admission is reflected in the records of the limited liability company.") (emphasis added); *id.* § 18-301.03[B] ("Section 18-301(b)(2) provides that an assignee of a limited liability company interest is admitted as a member *as provided in section 18-704 and at the time provided in and upon compliance with the limited liability company agreement* or, if the limited liability company agreement is silent, when any person's permitted admission is reflected in the records of the limited liability company.") (emphasis added). Section 18-301(b)(2) now simply reads: "In the case of an assignee of a limited liability company interest, as provided in § 18-704(a) of this title[.]"

(2) Unless otherwise provided in the limited liability company agreement, upon the affirmative vote or written consent of all of the members of the limited liability company.[178]

Chao argues that she was an assignee.[179] But whether she was an assignee or not, the result is the same: The LLC Act allows LLC agreements to set rules for acquiring membership. The LLC agreement here does so.

The Frosts were indisputably the sole Riverside Members at the time of Riverside's formation. They executed the LegalZoom Agreement on October 1, 2009.[180] Section 7.2 governs the transfer of membership interests:

> A Member shall not transfer any Membership Interests, whether now owned or later acquired, unless all of the Members consent to such transfer. A person may acquire Membership Interests directly from the Company upon the written consent of all Members. A person which acquires

---

[178] 6 *Del. C.* § 18-704(a); 2017 Del. Laws Ch. 271 (H.B. 372). Effective August 1, 2016, Section 18-704 now reads: "(a) An assignee of a limited liability company interest becomes a member: (1) As provided in the limited liability company agreement; (2) Unless otherwise provided in the limited liability company agreement, upon the vote or consent of all the members of the limited liability company."

[179] *Compare* Def.'s Opening Post-Trial Br. at 15 ("Frank upheld his end of the agreement and *gave me a portion of his equity* for good; the Frosts initially upheld their agreement and *gave me a portion of their* equity, but ultimately reneged . . . ." (emphasis added)) *and id.* at 25 ("[Iacono], the Frosts and I had a deal where I would own a small piece of Riverside if I worked for Riverside for at least the vesting period. . . . Frank upheld his end of the deal—*he transferred a portion of his equity to me* and acknowledge that I am entitled to keep my equity in perpetuity. The Frosts have reneged—although *they originally transferred a portion of their equity to me*, they took it back 8 years later.") (emphasis added), *with* Def.'s Answering Post-Trial Br. at 28 ("The Frosts argue that if the Court finds that I had something more than a profit sharing interest, the most I could have is an assignment of a non-voting economic interest that terminated when my employment was terminated. The Frosts have never told me that I was being granted an assignment of a member's interest. . . . [T]hey had never changed their tune to assignee of a member's interest. . . . It's a last-minute fallback argument that has no ties to reality.").

[180] LegalZoom Agreement.

> Membership Interests in accordance with this section shall be admitted as a Member of the Company after the person has agreed to be bound by the terms of this Operating Agreement by executing a consent in the form of Exhibit C.[181]

Broken down, Section 7.2 provides that to become a Member, the existing Members must execute a written consent and the new member must execute a consent in the form of Exhibit C agreeing to be bound by the LegalZoom Agreement. Indisputably, the Frosts did not execute a written consent. Nor did Chao execute a consent agreeing to be bound by the terms of the LegalZoom Agreement. Thus, Chao was not admitted as a Member under the terms of the LegalZoom Agreement.

Chao advances three arguments in response. First, she argues that "there's no default requirement that members must sign an operating agreement to be a member" because LLC Agreements "can be written, oral or implied."[182] Second, she argues that "the unanimous member consent provision under the [LLC] Act applies," and that she acquired her membership "because all the other members . . . agreed to it."[183] Third, she argues that "nothing in [the LegalZoom Agreement] precludes [her] from being a member based on unanimous member consent."[184] None of these arguments are availing.

First, the fact that an LLC agreement *may* be oral or implied does not change the fact that Riverside had a written agreement. Put differently, even though LLC agreements

---

[181] *Id.* § 7.2 (emphasis added).

[182] Def.'s Answering Post-Trial Br. at 10 (quoting 6 *Del. C.* § 18-101(9)).

[183] Def.'s Answering Post-Trial Br. at 10.

[184] *Id.*

do not have to be written, the founding Riverside Members executed a written agreement that established terms for admitting new members. That agreement governs.

Second, as Chao herself recognizes, the statute provides that "a person can become a member in accordance with the LLC agreement *or, if the LLC agreement does not so provide*, upon the consent of all members."[185] The LegalZoom Agreement includes terms that govern membership, so the default statutory rule of unanimous consent does not apply.[186]

Finally, Chao cites Section 7.2 of the LegalZoom Agreement with the first sentence omitted and argues that the provision's permissive language ("may") suggests that the Section 7.2 mechanism "is not the only possible way of becoming a member" under the LegalZoom Agreement and "only applies to situations where a member acquires her interest 'directly from the Company.'"[187] Chao misreads Section 7.2. Read in its entirety, Section 7.2 deals with both the transfer of membership interests *and* the acquisition of

---

[185] *Id.* at 9 (emphasis added) (citing 6 *Del. C.* 18-301(b)(1)); *see also Perry v. Neupert*, 2019 WL 719000, at *31 (Del. Ch. Feb. 15, 2019) ("As with Section 18-702(b), Section 18-301 defers in the first instance to the operative LLC agreement. [In this case], [t]he Company's LLC agreement did not address the admission of new members, so the default rule applies."); *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999) ("The basic approach of the Delaware Act is to provide members with broad discretion in drafting the Agreement and to furnish default provisions when the members' agreement is silent. The Act is replete with fundamental provisions made subject to modification in the Agreement (*e.g.* unless otherwise provided in a limited liability company agreement . . . .).") (internal quotation marks omitted).

[186] Even if it did, if Chao is an assignee of a limited liability company interest, the prior version of Section 18-704 would require "an affirmative vote or written consent," i.e., "a formal action of members." *In re Carlisle Etcetera LLC*, 114 A.3d 592, 599 (Del. Ch. 2015). There was no such formal action.

[187] Def.'s Answering Post-Trial Br. at 10–11 (quoting LegalZoom Agreement § 7.2).

membership interests directly from the Company.[188] Thus, the statement that "[a] person which acquires Membership Interests *in accordance with this section* shall be admitted as a Member of the Company" only after executing a consent encompasses those who receive their membership interests by transfer/assignment *or* directly from the Company. This construction is supported by the fact that Article 7 is titled "Withdrawal and Transfers of Membership Interests" and Section 7.2 is titled "Restrictions on Transfer"—neither suggests that Section 7.2 applies only when a person "acquire[s] Membership Interests directly from the Company."[189]

In short, for Chao to become a Member under the LegalZoom Agreement, written consent of all Riverside Members would have been necessary and Chao would have needed to agree in writing to be bound by the LegalZoom Agreement. Neither happened, so Chao did not become a Member under the LegalZoom Agreement.

As a final note, Chao has not argued that a distinction exists between holding an "Membership Interest" in and being a "Member" of Riverside.[190] But assuming such a distinction could be squared with the language of the LegalZoom Agreement,[191] it would

---

[188] *See* LegalZoom Agreement § 7.2 ("A Member shall not transfer any Membership Interests, whether now owned or later acquired, unless all of the Members consent to such transfer. A person may acquire Membership Interests directly from the Company upon the written consent of all Members . . . .").

[189] *Id.*

[190] *See, e.g.*, *EBG Hldgs. LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *2 n.27 (Del. Ch. Sept. 2, 2008) ("Economic interests in limited liability companies may be owned by persons who are not members.").

[191] Section 7.2 could be interpreted as distinguishing between (i) holding a Membership Interest, which occurs after the existing members execute a written consent granting the Membership Interest, and (ii) becoming a Member, which occurs after the new member

not save Chao's case. Even if the parties had intended to assign a membership interest to Chao, the most that she could have acquired would have been a non-voting economic interest under Section 18-702(b). "An assignment of a limited liability company interest does not entitle the assignee to become or to exercise any rights or powers of a member."[192] Instead, absent compliance with all formal admission requirements, an assignee receives only a non-voting economic interest.[193] As a non-member, Chao could not have blocked the adoption of the 2015 LLC Agreement. As explained below, under the 2015 LLC Agreement, Chao's interest would have terminated upon her departure from Riverside.[194]

---

agrees to be bound by the terms of the LegalZoom Agreement. Again, Section 7.2 provides that "[a] person may acquire Membership Interests directly from the Company upon the written consent of all Members. A person which acquires Membership Interests in accordance with this section shall be admitted as a Member of the Company after the person has agreed to be bound by the terms of this Operating Agreement by executing a consent . . . ." The definition of "Member" arguably supports this construction of Section 7.2. The LegalZoom Agreement defines "Member" as "a Person who acquires Membership Interest, as permitted under this agreement, *and* who becomes or remains a member." LegalZoom Agreement art. I. Yet it is difficult to reconcile this construction of Section 7.2 with other defined terms. *See, e.g.*, *id.* (defining "Membership Interests" as "either Percentage Interest or Units, based on how ownership in the Company is expressed in Exhibit A," which lists the "Members"); *id.* (defining "Percentage Interest" as "a percent ownership in the Company entitling *the holder* to an economic and voting interest in the Company" but defining a "Unit" as "a unit of ownership entitling *the Member* holding such Unit to an economic interest and a voting interest in the Company").

[192] 6 *Del. C.* § 18-702(b)(1); *see also Achaian, Inc. v. Leemon Family LLC*, 25 A.3d 800, 804–805 (Del. Ch. 2011) ("[I]t is clear that the default rule under the Act is that an assignment of an LLC interest, by itself, does not entitle the assignee to become a member of the LLC; rather, an assignee only receives the assigning member's economic interest in the LLC to the extent assigned.").

[193] 6 *Del. C.* § 18-702(b)(2).

[194] *See* 2015 LLC Agreement § 4.9(c). Chao argues that the Frosts never told her she was being granted an assignment, and that they brought this argument for the first time in their pre-trial answering brief. *See* Def.'s Answering Post-Trial Br. at 28. But, as noted above,

44

### B. The 2015 LLC Agreement Is Riverside's Operative LLC Agreement.

Because Chao was not a Member under the LegalZoom Agreement, it follows that she could not block the adoption of the 2015 LLC Agreement based on Section 10.1 of the LegalZoom Agreement, which provided that the operating agreement "shall not be modified or amended in any respect except by a written instrument executed by all of the Members."[195] The Frosts signed the 2015 LLC Agreement on March 20, 2015. Even assuming that Iacono's company, South Haven, was a Riverside Member—though neither he nor it executed a formal consent—Iacono signed the 2015 LLC Agreement on behalf of South Haven along with a side letter on April 4, 2018.[196] Thus, the 2015 LLC Agreement is Riverside's current operating agreement.

### C. Chao's Counterclaims

Chao asserts a claim for breach of contract (Count I),[197] an alternative claim for unjust enrichment (Count II),[198] and a group of unnumbered "Other Counts" described in a single paragraph as including "breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and promissory estoppel claims."[199] Although the Riverside

---

it is unclear to the court if their contention is even inconsistent with how Chao herself characterizes her acquisition of the shares.

[195] LegalZoom Agreement § 10.1.

[196] JX-198; JX-227 at 9.

[197] Am. Verified Countercl. ¶¶ 59–62.

[198] *Id.* ¶¶ 63–65.

[199] *Id.* ¶ 66.

Parties advance defenses to the counterclaims, this decision need not address those defenses because Chao has not proven her counterclaims.

### 1. Breach of Contract

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."[200] A contract is formed when the parties have a "meeting of the minds."[201] "[O]vert manifestation of assent—not subjective intent—controls the formation of a contract."[202] A contract must be sufficiently definite,[203] meaning that "the court can

[200] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

[201] *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1212 (Del. 2018) ("One of the first things first-year law students learn in their basic contracts course is that, in general, 'the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.' In other words, there must be a 'meeting of the minds' that there is a contract supported by consideration.") (quoting Restatement (Second) of Contracts § 17 (1981)); *see also Darby v. New Castle Gunning Bedford Educ. Ass'n*, 336 A.2d 209, 211 (Del. 1975) ("Agreement by its nature presumes the power and discretion to disagree until and unless there is a meeting of the minds of the parties in the same intention."); *Schaeffer v. Lockwood*, 2021 WL 5579050, at *15 (Del. Ch. Nov. 30, 2021) ("Under Delaware law, the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration. A valid contract exists only if the parties have manifested mutual assent to be bound by that bargain.") (internal quotation marks and citations omitted).

[202] *Eagle Force Hldgs., LLC*, 187 A.3d at 1230 (internal quotation marks omitted); *see also id.* (citing 4 Williston on Contracts § 6.3 (4th ed. May 2022 update) ("[S]ince the formation of informal contracts depends not upon an actual subjective meeting of the minds, but instead upon outward, objective manifestations of assent, an actual intention to accept is unimportant except in those situations when the acts or words of the offeree are ambiguous.")).

[203] *See Scarborough v. State*, 945 A.2d 1103, 1112 (Del. 2008) ("As every first year law student learns, one of the central tenets of contract law is that a contract must be reasonably definite in its terms to be enforceable."); *see also Eagle Force Hldgs., LLC*, 187 A.3d at 1212–13 ("In *Osborn ex rel. Osborn v. Kemp*, this Court set forth the elements of a valid, enforceable contract. We explained that 'a valid contract exists when (1) the parties

. . . ascertain what the parties have agreed to do," and provide a basis for determining the existence of a breach and for giving an appropriate remedy.[204]

A party claiming a breach of contract "has the burden of proving each element . . . by a preponderance of the evidence."[205] Something is proven by a preponderance of the evidence when it "is more likely than not."[206] The court applies this preponderance standard regardless of whether a party appears *pro se*, as here.[207]

The question here is what agreement or understanding the parties reached concerning Chao's interest, if any. Chao asserts that the Riverside Parties "have breached the contract they entered into with [Chao] in which [she] would become a 4% owner of Riverside if [she] met the vesting conditions."[208] Chao argues that they breached that

---

intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration.'") (quoting 991 A.2d 1153, 1158 (Del. 2010)); *Schaeffer*, 2021 WL 5579050, at *16 ("A contract must contain all material terms in order to be enforceable . . . . Even if the parties agree to be bound, where they fail to agree on one or more essential terms, there is no binding contract.") (internal quotation marks and citations omitted).

[204] *Eagle Force Hldgs., LLC*, 187 A.3d at 1232.

[205] *AlixPartners, LLP v. Mori*, 2022 WL 1111404, at *11 (Del. Ch. Apr. 14, 2022); *see also Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2013) (stating that the party asserting breach has "the burden to prove his breach of contract claim by a preponderance of the evidence.").

[206] *Stone & Paper Invs., LLC v. Blanch*, 2021 WL 3240373, at *16 (Del. Ch. July 30, 2021) (quoting *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *16 (Del. Ch. Sept. 10, 2018)).

[207] *See AlixP'rs LLP*, 2022 WL 1111404, at *11 (applying the preponderance standard in a limited partnership agreement dispute between a represented party and one appearing *pro se*).

[208] Def.'s Opening Post-Trial Br. at 9.

contract in two ways: first, by denying her membership interest and, second, by engaging in activities that kept her from receiving a "fair share" of Riverside's profits.[209]

The Riverside Parties respond that Chao's interests were not formalized before Riverside adopted the 2015 LLC Agreement. In a slight divergence from their termination letter,[210] the Riverside Parties' litigation position is that Chao was either a non-managing member under the 2015 LLC Agreement or that her interests were an informal precursor to the Profit-Sharing Plan. If Chao was a non-managing member under the 2015 LLC Agreement, then the Frosts terminated her membership status through the March 19, 2019 letter under § 4.9(c) of the 2015 LLC Agreement.[211] If her interest was an informal precursor to the Profit-Sharing Plan, then her interest terminated when she stopped working at Riverside.

To evaluate Chao's claim that she was promised to be made a Member under the LegalZoom Agreement, this analysis focuses on facts that shed light on Chao's status prior to the time that the Frosts began treating her as a non-managing member under the 2015 LLC Agreement. Setting aside the (important) fact that Chao was not made a Riverside Member under the terms of the LegalZoom Agreement (and also setting aside arguments that a claim to enforce such an agreement would be time barred), Chao's position that the Frosts promised to make her a Riverside Member under the LegalZoom Agreement finds

---

[209] *Id.* at 9–10.

[210] JX-153.

[211] *See* JX-131 § 7(a) (draft separation agreement that the Riverside Parties sent to Chao including a release of any claims arising under the 2015 LLC Agreement).

48

some support in the record. For example, Chao and Iacono testified that they believed that Chao was granted an interest that she would retain upon her departure from Riverside. Chao credibly testified that she believed, based on her time working for Lehman Brothers, that she could take her interest with her.[212] Iacono testified that he thought Chao was granted a perpetual right in the profits of Riverside.[213]

The strongest support for Chao's position is found in the following contemporaneous documents including and predating the May 2016 Email referring to Chao as a Member and paying her distributions.

---

[212] *See* Chao Dep. 101:18–23 ("Q. So I take it from your answer that you believe that you … actually owned the Lehman shares that were granted to you in connection with your employment? Did I understand you correctly? A. Yes. Those shares were mine."); *see also* Def.'s Answering Post-Trial Br. at 14 ("[I]t's common for Wall Street firms to give employees stock awards, and I quoted from an article that shows that stock awards are a standard component of investment banking compensation packages."); Trial Tr. 322:17–324:11 (Joyce) (describing the "tracking shares" that Wall street firms pay).

[213] *See* Iacono Dep. 153:6–12 ("Q. Okay. And then once vested, for how long am I entitled to receive my pro rata share of the profits of the company? . . . A. To answer your question, until—forever, until you sell the interest or Riverside is dissolved."); *id.* 163:22–164:7 ("I can't say specifically that Joyce, Chris, and I looked at each other and said, yes, you know, this is a permanent grant of equity that vests on the schedule. But what I can say is that, you know, based on the fact that we didn't say it was a profit-sharing plan at the time, and based on the language that we used to refer to it, I believed it was a grant of interest in the profits of the company in perpetuity."); *id.* 170:3–11 ("[I]n my mind there was an understanding that Grace had an interest in four percent of the profits in perpetuity. And if it has any legal basis, I mean, I never really was an expert in the intricacies of the Delaware LLC statute. But, you know, in my mind, as a matter of contract, I believe that that was a permanent grant of an equity interest that vested on the schedule."); *id.* 98:3–10 (testifying that once vested, Chao "permanently owned that equity interest in the company"); *id.* 106:16–107:3 ("By my understanding of what we gave you, once vested, your equity interest was a permanent equity interest, and you did not have to continue as an employee of Riverside to retain that equity interest once it was vested.").

49

- The cover letters to the Year End 2011–2015 K-1s addressed Chao as a "Member."[214]

- Joyce's August 7, 2012 email to the NFA, contained a capital account identifying Chao as a "Member."[215]

- Chao is identified as a member in Riverside's capital account, which Joyce sent to the NFA on August 7, 2012.[216]

Similarly, Riverside represented to the IRS and other tax authorities that Chao was a "partner" of Riverside for tax years 2011 through 2018, which includes years before the 2015 LLC Agreement was adopted.[217] Other books and records state the same.[218] This is the title that the Riverside Members (Joyce, Chris, and Iacono) used to describe their relationship.[219] And Chao testified that Riverside verbally told her in a meeting sometime between December 2010 and February 2011 that she would be an "owner" of Riverside.[220]

---

[214] *See, e.g.*, JX-222 (compilation of the K-1s).

[215] JX-19 at 1.

[216] JX-19.

[217] *See* JX-235; *see also* JX-117 (Riverside's accountant describing Chao as a "limited partner").

[218] *See* JX-124 ("Partner's Equity" in a May 24, 2018 balance sheet statement at December 31, 2017); JX-180 ("Partner's Equity" in a September 20, 2020 account QuickReport); JX-184 ("Partner Distributions" in a separate September 20, 2020 account QuickReport); JX-201 ("Partner Distribution" in a March 17, 2016 Profit and Loss Statement for 2015); JX-202 ("Partner Distribution" in a March 28, 2017 Profit and Loss Statement for 2016); JX-207 ("Partner's Equity" in an undated internal report addressing company financials between 2016 and 2018); JX-234 ("Partner's Equity" in a pair of August 26, 2021 balance sheet statements at December 31, 2017 and December 31, 2018).

[219] *See, e.g.*, Iacono Dep. 17:6–17, 82:3–9 (testifying that his title was "partner"); Trial Tr. 93:17–22 (Chris) (describing Iacono as a "partner" and "full-on one-third percentage owner of Riverside").

[220] Chao Dep. 97:18–98:14.

Chao also points to multiple contemporaneous documents referring to her interest as "equity." The term equity is often used to describe common stockholders or, in the LLC context, members; thus, references to "equity" could be viewed as supporting Chao's position.[221]

The Frosts' position finds support in the record as well. For example, the Frosts credibly testified that did not intend to grant Chao an interest that she would keep upon separation from Riverside.[222]

Further, although the way the parties described Chao's interest varied over time, many contemporaneous documents referring to Chao's interests using the vague term "shares" lend credence to the Frosts' position that Chao's award was thought of as an informal precursor to the Profit-Sharing Plan.

---

[221] *See, e.g.*, JX-8 and JX-9 (the Frosts and Iacono described the award as "equity" among themselves on December 14, 2010 and to Chao in the 2011 Compensation Summary (although the 2011 Compensation Summary also described the equity interests as "shares")); JX-12 (Chao's 2011 Compensation Summary described her as an "equity owner[]" owning "shares"); JX-38 (Chao, after hearing about the new operating agreement, emailing Joyce on January 15, 2015, confirming that it would "reflect the true nature of the *equity* that I had been awarded several years ago") (emphasis added); JX-205 and JX-206 (identifying Chao as having received a four percent "equity grant" but also referring to her as Riverside's first "employee profit sharing participant"); JX-11 (Joyce describing Chao's interests as "Class B non-voting equity," stating in an email dated January 24, 2012, that Riverside had "given out Class B non voting equity").

[222] *See* Trial Tr. 27:18–28:3, 29:18–30:9, 278:14–18 (Chris); *id.* 177:7–19, 204:23–205:2 (Joyce); *id.* 29:18–30:9 (Chris) (Chris testifying that he "didn't think" about "what happens [to the equity] if Grace leaves," but he testified that "had we talked about it, there was no way that it would make sense, given our business, to allow someone to take 2 percent of the company with them at the time" because it "would allow her to . . . work at a competitor, start up her own business," plus "it wasn't market at all . . . . So at the time, that was my understanding of what her equity was.").

- Chao's 2011 Compensation Summary stated that Chao owns "shares" representing a certain percentage of ownership.[223]

- Chao's Compensation Summaries and Salary Adjustment and Award Letters beginning in 2014 refer to Chao's interests as "shares."[224]

- After Chao was terminated, the new "director" Riverside hired to replace her was awarded four "shares" in Riverside on March 15, 2019.[225]

- The term "shares" appears nowhere in the LegalZoom Agreement or the Delaware LLC Act; the term used for equity there is "membership interest."[226]

- In contrast, the Profit-Sharing Plan effective January 1, 2014 uses the term "shares."[227]

Perhaps more probative, the Frost's position finds further support in the parties' conduct.

- Chao never took action as a Riverside Member. As Chao admitted, she "never cast a formal vote" on any company decision, participated in corporate governance, nor did she attend meetings regarding the strategic planning of Riverside that Chris, Joyce, and Iacono attended.[228] This is consistent with what Chris, Joyce, and Iacono believed—that Chao did not have the right to vote or participate as an *equal* partner, member, or manager of Riverside, so she never did so.[229] Indeed, Chao testified she did not think

---

[223] JX-12.

[224] JX-29 (July 1, 2014); JX-57 (December 23, 2015); JX-74 (January 27, 2017); JX-89 (January 15, 2018).

[225] JX-144; JX-145.

[226] Def.'s Opening Post-Trial Br. at 12; LegalZoom Agreement; *see also* 6 *Del. C.* § 18-101(10).

[227] *See* JX-30.

[228] Chao Dep. 249:21–25; *see also* Trial Tr. 446:19–447:8 (Chao) (testifying that she never voted or consented to any matter of corporate governance or internal affairs); Iacono Dep. 52:16–53:10; Chris Dep. 36:7–8 ("We never looked for [Chao] to be involved in management.").

[229] *See* Chris Dep. 35:12–36:12 ("I'll also say—so I know what we gave you and why we gave you what we gave you, and what we—that, I definitely know. It's up to the courts to

about the voting rights her "equity" might or might not carry,[230] although voting rights are prototypical rights of LLC members.[231] That said, Chao was involved in company-wide discussions regarding the formation of Riverside Risk Capital and the development of other business lines,[232] and she was "the front face" for a handful of clients.[233]

- Chao was not compensated like other members. Unlike Chao, the Frosts' compensation was tied entirely to Riverside's performance and came

decide whether you're a member or not, but I'm very, very clear on what we gave you, and it doesn't match up with what a member is. What we gave you was equity as part of your compensation as an incentive to help grow the business and stay at Riverside. That's all we gave you. And that's what we give people as part of the profit-sharing plan. The other attributes of a member, we didn't give you those attributes. Q. What other attributes are those? A. Well, you didn't' qualify—we never agreed—you were never involved in management. We never looked for you to be involved in management. You never made a capital contribution. You were always paid as a W-2. And you were—we never looked to you as being a member. We never treated you as being a member."); *see also id.* at 37:1–10 (listing participation in management, the right to vote, and access to books and records as "just a couple" of indicia of member status); Trial Tr. 30:10–31:1 (Chris) (testifying that he did not believe the 2 percent gave Chao a right to vote on the business matters of the company, participate in management, or access Riverside's books); Iacono Dep. 38:1–39:5 (testifying that Chao never had a say or voted on corporate governance, internal affairs or strategic planning, although he testified that Chao became a "partner" when her equity vested); *id.* 42:22–43:14 (testifying that he thought of himself and the Frosts as "members" under the LegalZoom Agreement but not Chao); *id.* 62:11–16 ("We never discussed giving Grace a say in corporate governance matters . . . .").

[230] Chao Dep. 96:6–10.

[231] *See, e.g.*, Nicholas G. Karambelas, *Limited Liability Companies: Law, Practice and Forms* § 8:3 (2021) ("A membership interest entitles the member to three broad categories of rights: 1. Governance rights which entitle the member to decide on the fundamental structural issues of the LLC . . . 2. Management rights which entitle the member to participate in the operation of the business of the LLC . . . and 3. Financial rights . . . ."). Of course, as Chao points out, "a member need not have voting rights to be a member" and a "limited liability company agreement may provide that any member or class or group of members shall have no voting rights." Def.'s Answering Post-Trial Br. at 12 (citing 6 *Del. C.* § 18-302(a)). The LegalZoom Agreement, however, did not provide for separate classes.

[232] *See* Trial Tr. 344:17–345:2, 416:1–419:7 (Chao).

[233] *Id.* 279:14–23 (Joyce).

primarily in the form of guaranteed payments.[234]   Unlike Chao, the Frosts paid self-employment taxes on the majority of their salary and bonuses, whereas Riverside paid its share of employment taxes on Chao's salary and bonuses.[235]

- Again, Chao never signed an LLC agreement.  Riverside provided Chao with the LegalZoom Agreement in 2014 but "wouldn't let [Chao] sign it."[236] "[T]his was after they had told [Chao that she] was not an owner, that [she] only held a profit-sharing interest."[237]

It is no easy task to make sense of the hodgepodge of facts in the record regarding Chao's interests.  Ultimately, however, as the party alleging an agreement was created and breached, Chao bears the burden of proof.  She must demonstrate a meeting of the minds, overt manifestation of a sufficiently definite agreement, and a basis for determining the existence of a breach and an appropriate remedy.[238]  The imprecision of the parties' deal—

---

[234] *See, e.g.*, Joyce Dep. 23:9–13, 47:5–14 (testifying that the members, Joyce, Chris, and Iacono, received guaranteed payments as compensation); Trial Tr. 470:11–17 (Chao) (testifying that her guaranteed payments "were of a *de minimis* amount" and received "the majority" of her compensation "through payroll").

[235] *See, e.g.*, Trial Tr. 210:16–212:7 (Joyce) (testifying that Chao "never complained about the W-2 because we pay all the employee taxes" and that in discussions about whether Chao was a member, telling her that the Frosts "pay taxes out of our own cash" and "have to pay estimated taxes every quarter," "were paid twice a year" and that "she didn't want to do that for kind of obvious reasons: Because, one, it's harder to report; two, you have to pay estimated taxes; three, the cash has to come from somewhere.  And, importantly, we pay all of her payroll taxes.  That's not an insignificant amount, a $400,000 comp."); *But see* Chao Dep. 154:22–157:16, 257:12–25 (testifying that she understood that she was paying self-employment taxes but unsure as to what years and failing to identify it on certain K-1s).

[236] Chao Dep. 129:17–23.

[237] *Id.* 132:19–24.  Of course, Chao testified that "they produced the operating agreement to me because, at that point, they conceded that I was a member, but they wanted me to convert my member's interest into a profit-sharing interest." *Id.*

[238] *Eagle Force Hldgs., LLC*, 187 A.3d at 1212, 1229, 1232 (internal citations omitted).

54

and corresponding lack of agreement—is manifest in the parties' indiscriminate use of various terms throughout the agreement (i.e., share, equity, owner, partner, members), and conflicting actions throughout the relevant time.[239] Chao has not borne her burden of proving that the Frosts agreed to make her a Riverside Member under the LegalZoom Agreement.

So, what was Chao's "4%"? The Frosts wanted to treat her as a non-managing member under the 2015 LLC Agreement. But Chao rejected that offer, so there was no meeting of the minds to make her one. (And the Frosts later terminated that interest through the March 19, 2019 letter in any event.)

Alternatively, as the Frosts propose, Chao's interests were a percussor to the profit-sharing arrangement. Recall some of the vernacular of the record—the Frosts granted Chao "shares" of "equity" as compensation for her work. That is the language of her Compensation Summaries. Black's Law Dictionary defines "shares" as "[a]n allotted portion owned by, contributed by, or due to someone" or "represent[ing] an equity or ownership interest," depending on the usage.[240] "Equity" is defined as "[a]n ownership interest in property, esp[ecially] a business."[241] There was an understanding that Chao, to

---

[239] *See, e.g.*, Iacono Dep. 71:11–24 ("[S]hare or equity are informal terms that people use to refer to equity interest in entities. Even though I know the word share may not be the proper term as a legal matter to refer to a membership interest in an LLC.").

[240] Black's Law Dictionary, *Share* (11th ed. 2019).

[241] *Id.*, *Equity*.

some degree, would be an "owner" of Riverside and share in its profits.[242]  By 2015, the Frosts had latched onto a "synthetic equity" concept, supporting this notion.

If Chao's interests were a precursor to the later Profit-Share Agreement, then Riverside satisfied its obligations under that agreement by paying her profit-sharing bonuses and distributions while she was employed there.

The end result is that Chao has not proven that the Riverside Parties breached any contract with her.

### 2. Unjust Enrichment

"Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[243]  To prove a claim for unjust enrichment, there must be

---

[242] *See, e.g.*, Chao Dep. 119:19–24 ("Q. [W]hat was your understanding about of your rights or any rights that you had with respect to your ownership interest in Riverside?  A. As I would get to share in the profits of the company."); Chris Dep. 15:20–16:13 ("Q. What does equity mean to you?  A. . . . I think the term equity can be interpreted in a very wide way.  But with respect to Riverside, it was a percentage of the profits that we had at the end of each year.  That was equity."); *id.* 18:17–25 ("Q. Chris, when you say equity is the percentage of profits, are you saying that a holder of equity is entitled to a percentage of profits of the company?  A. Yes.  Yes.  Q. And for how long are they entitled to a percentage of the profits of the company?  A. With respect to—at Riverside, as long as they were employed by Riverside."); Trial Tr. 29:8–17 (Chris) ("Q. At the time of—that JX 12 was issued—so February of 2012, did you have an understanding—and if you did, what was it?—as to the nature of the economic interest that's represented here, 2 percent initially?  What was it?  A. Yeah, it was—it was 2 percent of Riverside's profits, so our net income at the end of every year.  And my understanding at that time is if we sold the company, the holder of the 2 percent interest would participate in that 2 percent."); *id.* 477:17–24 (Chao) ("I definitely thought that my equity entitled me to the profits of the company in perpetuity.").

[243] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, and (4) the absence of justification.[244]

Chao argues that "[t]he Frosts' actions have enriched themselves at [her] expense unjustifiably," as "there is no justification for the Frosts' denial of [her] member status" and "taking [her] share of Riverside's profits since 2018, the bonus distribution [she] should have received in 2018, and other funds or profit allocations [she] was entitled to as a member."[245]

The Riverside Parties counter that Chao's unjust enrichment claim is "fatally flawed."[246] Again, they state that either Chao was entitled to profit-sharing interests or the 2015 LLC Agreement governed, and either way, "any interest Grace had the Company was forfeited" when she was terminated.[247] They also argue that the unjust enrichment claim is barred by laches.[248]

The court need not reach the laches argument. As discussed above, the Riverside Parties satisfied any agreement that they reached with Chao. For that reason, Chao has not proven that the Riverside Parties benefitted at her expense. Nor has Chao shown that they unjustifiably impoverished her by the acts she names.

---

[244] *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 341–51 (Del. Ch. 2022) (clarifying that, absent a dispute over jurisdiction, "the absence of a remedy at law" is not a necessary element of a claim of unjust enrichment).

[245] Def.'s Opening Post-Trial Br. at 27.

[246] Pl. and Third-Party Defs.' Opening Post-Trial Br. at 27.

[247] *Id.*

[248] *Id.*

### 3. Implied Covenant of Good Faith and Fair Dealing

In the first of several causes of action listed together at the end of Chao's counterclaim as "Other Counts,"[249] Chao alleges that the Frosts breached the implied covenant of good faith and fair dealing.

The Delaware Supreme Court in *Dieckman v. Regency GP LP* stated when the implied covenant of good faith and fair dealing applies:

> The implied covenant is inherent in all contracts and is used to infer contract terms "to handle developments or contractual gaps that the asserting party pleads neither party anticipated." It applies "when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain[.]"[250]

The Supreme Court has described the implied covenant as a "cautious enterprise" that "is best understood as a way of implying terms in the agreement, whether employed

---

[249] Am. Verified Countercl. The Riverside Parties describe these counts as "unpled." Pl. and Third-Party Defs.' Answering Post-Trial Br. at 26. The court disagrees. These counts were expressly included in the counterclaims and appeared throughout this litigation. Am. Verified Countercl. ¶ 66; *see also* Dkt. 106 (Def.'s Opening Pre-Trial Br.) at 15–19 (discussing, with their own headings, counts for breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and promissory estoppel). Plaintiff and Third-Party Defendants received plenty of notice that these claims were front and center in this dispute. *See Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 39 (Del. 1996) ("Rule 8(a) requires that the complaint need 'only give general notice of the claim asserted . . . .'") (quoting *Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del. 1985)); *see also Brooks v. BAC Home Loans Servicing, LP*, 2012 WL 3637238, at *2 (Del. Aug. 23, 2012) ("This Court has noted that a *pro se* litigant's filings should not be held to the same stringent drafting standards expected of a lawyer.").

[250] 155 A.3d 358, 367 (Del. 2017) (quoting *Nemec*, 991 A.2d at 1125 (internal citations omitted)).

to analyze unanticipated developments or to fill gaps in the contract's provisions."[251]  The

Supreme Court has cautioned that "Delaware's implied duty of good faith and fair dealing

is not an equitable remedy for rebalancing economic interests after events that could have

been anticipated, but were not, that later adversely affected one party to a contract."[252]

Generally, the "implied covenant does not apply when the contract addresses the

conduct at issue, but only when the contract is truly silent concerning the matter at hand."[253]

Moreover, "even where the contract is silent, [a]n interpreting court cannot use an implied

covenant to re-write the agreement between the parties and should be most chary about

implying a contractual protection when the contract could easily have been drafted to

expressly provided for it."[254]

Nonetheless, the implied covenant may add terms where "the parties must have

intended them and have only failed to express them because they are too obvious to need

expression. . . .   Stated another way, some aspects of the deal are so obvious to the

participants that they never think, or see no need, to address them."[255]  On that basis, for

instance, this court has implied contractual language in a limited partnership agreement

[251] *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 506–507 (Del. 2019) (citation and internal quotation marks omitted).

[252] *Id.* at 506–507 (quoting *Nemec*, 991 A.2d at 1128).

[253] *Id.* (citations and internal quotation marks omitted).

[254] *Id.* at 506–507 (alteration in original) (internal quotation marks omitted).

[255] *In re CVR Refining LP Unitholder Litig.*, 2020 WL 506680, at *15 (Del. Ch. Jan. 31, 2020) (internal quotation marks omitted); *see also Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2019 WL 4927053, at *24 (Del. Ch. Oct. 7, 2019) (implying a term in a limited partnership agreement that the general partner not "manipulate the unit price" before exercising a call option).

requiring a general partner not to "subvert price-protection mechanisms" for limited partners.[256]

Chao asserts that the Frosts breached the implied covenant "in at least two ways."[257] First, she argues that they engaged in "self-dealing activities," such as diverting Riverside business to Riverside Risk Capital, grossing up only their own ownership percentages when Iacono reduced his, and diverting profits to outsized compensation when those profits should have gone to members.[258] Second, she argues that the Frosts treated her worse than they did Iacono.[259]

The Riverside Parties respond that Chao "nowhere specifies either the contractual duties or the gaps that form the basis of her implied covenant theory. Her effort to base an implied covenant claim on general allegations of bad faith and a free-floating duty fail as a matter of law."[260]

Chao has not proven a claim for breach of an implied covenant. She has failed to identify any contractual gaps that the implied covenant needs to fill. She has not proven the bad conduct on which she bases her claim; although the Frosts disagreed with Chao over the contours of her membership status, their disagreement was genuine rather than opportunistic, fraudulent, or the result of bad faith. The Frosts honored the only agreement

[256] *In re CVR Refining LP Unitholder Litig.*, 2020 WL 506680, at *15.

[257] Def.'s Opening Post-Trial Br. at 15.

[258] *Id.*

[259] *Id.* at 15, 24.

[260] Pl. and Third-Party Defs.' Answering Post-Trial Br. at 29.

supported by the record. Moreover, nothing suggests that "fruits of the bargain" were frustrated for Chao. The bargain simply did not operate as Chao hoped or believed.

### 4. Breach of Fiduciary Duty

Chao argues that the Frosts breached their fiduciary duties to her "by trying to take [her] member's interest as their own and directing Riverside to sue [her]."[261] Under Delaware law, unless an LLC agreement provides otherwise, "the Delaware Limited Liability Company Act . . . contemplates that equitable fiduciary duties will apply by default to a manager or managing member of a Delaware LLC."[262]

Chao's claim for breach of fiduciary duty fails for two reasons. First, Chao only offers LLC membership as a basis to impose fiduciary duties, but because she never became a Riverside Member, the Frosts never owed them to her.[263] Second, the 2015 LLC

---

[261] Def.'s Opening Post-Trial Br. at 16.

[262] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012); *see id.* ("A plain reading of Section 18-1101(c) of the LLC Act is consistent with Section 18-1104 and confirms that default fiduciary duties apply.") (citing 6 *Del. C.* §§ 18-1101(c), 18-1104); *see also Ross Hldg. and Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374261, at *12 (Del. Ch. Sept. 4, 2014) ("By default, the traditional fiduciary duties applicable to corporations apply to limited liability companies.").

[263] *See, e.g.*, *Kelly v. Blum*, 2010 WL 629850, at *10 (Del. Ch. Feb. 24, 2010) ("In the case of fiduciary duties, the LLC Act permits LLC contracting parties to expand, restrict, or eliminate duties, including fiduciary duties, owed by members and managers *to each other and to the LLC*.") (emphasis added); 6 *Del. C.* § 18-1101(c) ("To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) *to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement*, the member's or manager's or other person's duties may be expanded or restricted or eliminated . . .") (emphasis added). The LLC Act, paired with this court's precedent, thus contemplate fiduciary duties that flow to members rather than employees like Chao.

Agreement expressly eliminated fiduciary duties as is permitted under Delaware's LLC Act.[264] There cannot be a breach of non-existent fiduciary duties.[265]

### 5. Promissory Estoppel

Chao argues that "the same evidence proving that a contract was breached prove [sic] that a promise was broken," namely, that she "would own a small piece of Riverside if [she] worked for Riverside for at least the vesting period."[266] This promise was discussed verbally and memorialized in writing.[267] The promise was made to induce Chao to stay at Riverside, which she did—for eight years. Chao argues that she was underpaid relative to what she was making before she joined Riverside,[268] and underpaid relative to what other Managing Directors in the industry were making,[269] despite Riverside's success.

"Under Delaware law, to have a valid claim based on promissory estoppel, [a party] must show by clear and convincing evidence that (1) a promise was made; (2) it was the reasonable expectation of the promisor . . . to induce action or forbearance on the part of the promise; (3) the promise . . . reasonably relied on the promise and acted to his detriment;

---

[264] JX-47 § 5.4; 6 *Del. C.* § 18-1101(c).

[265] *See, e.g.*, *Ryan v. Buckeye P'rs*, 2022 WL 389827, at *8–9 (Del. Ch. Feb. 9, 2022) (dismissing a breach of fiduciary duty claim where the limited partnership agreement eliminated fiduciary duties).

[266] Def.'s Opening Post-Trial Br. at 25.

[267] Trial Tr. 339:10–16 (Chao); JX-12.

[268] Chao proved that she made on average less per year when working for Riverside than she did in one exemplary year working for Morgan Stanley. *See* Def.'s Opening Post-Trial Br. at 25–26; *see also* Trial Tr. 231:23–232:8 (Joyce).

[269] Trial Tr. 232:12–233:4 (Joyce).

and (4) that such a promise is binding because injustice will be avoided only by enforcement of the promise."[270]

Historically, the doctrine of promissory estoppel existed to "h[o]ld individuals liable on their promises despite the absence of consideration."[271]  In other words, it served as a consideration substitute.[272]  Over time, however, "the doctrine appears to have evolved . . . into one that provides a basis for expectancy relief," and promissory estoppel is viewed as an equitable remedy that "often turn[s] on 'whether injustice could have been avoided only be an enforcement of the promise.'"[273]  Indeed, "[t]he prevention of injustice is the 'fundamental idea' underlying the doctrine of promissory estoppel" in Delaware.[274]

---

[270] *Ramone v. Lang*, 2006 WL 905347, at *14 (Del. Ch. Apr. 3, 2006); *see also Alltrista Plastics, LLC v. Rokline Indus., Inc.*, 2013 WL 5210255, at *9 (Del. Super. Ct. Sept. 4, 2013) ("The purpose of the promissory estoppel doctrine is to prevent injustice.").

[271] Williston on Contracts, *supra* § 8:4.

[272] Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 15.02[c], 15-11 (2d ed. 2020) ("Historically, courts have treated promissory estoppel as a consideration substitute").

[273] *Id.* § 15.02[c] (quoting *Grunstein v. Silva*, 2009 WL 4698541, at *10 (Del. Ch. Dec. 8, 2009)); *see also id.* ("Vice Chancellor Noble has explained that this doctrinal focus on avoiding injustice suggests that Delaware courts recognize that promissory estoppel is, 'at base, an equitable remedy' and not purely a consideration substitute") (quoting *Grunstein*, 2009 WL 4698541, at *10); Williston on Contracts, *supra*, § 8:8 ("The Doctrine of Promissory Estoppel has expanded dramatically since the early 20th Century. . . . [T]he doctrine is now applicable to any relied-upon promise, whether donative or commercial, fully thought out or preliminary.  So long as the threat of justifiable reliance by the promise and the hardship involved in the refusal to enforce the promise are present, such cases do not harm the classical conception of contract as the result of a bargained-for exchange, and they clearly advance the interests of justice.  It is essential, however, that the courts continue to insist upon an adherence to the elements necessary to invoke the doctrine[.]").

[274] *Chrysler Corp. (Delaware) v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1034 (Del. 2003) (citing *Chrysler v. Quimby*, 144 A.2d 123, 133 (Del. 1958)).

Then-Vice Chancellor Strine summarized the purpose of Delaware's promissory estoppel doctrine in *Ramone v. Lang*:

> Promissory estoppel involves informal promises for which there was no bargained-for exchange but which may be enforceable because of antecedent factors that caused them to be made or because of subsequent action that they caused to be taken in reliance. The purpose of the promissory estoppel doctrine is to prevent injustice. . . . [P]romissory estoppel is fundamentally a narrow doctrine, designed to protect the legitimate expectation of parties rendered vulnerable by the very processing of attempting to form commercial relationships. . . . [T]he mere routine role of promissory estoppel should be to assure that those who are reasonably induced to take injurious action in reliance upon non-contractual promises receive recompense for that harm.[275]

Delaware courts have been careful when considering promissory estoppel claims to avoid rendering them "an imprecise judicial cost-shifting exercise."[276] In particular, Delaware courts require that there be "a promise and reliance thereon"; expressions of opinion, expectations, assumptions, or preliminary discussions will not establish promissory estoppel.[277] And the Supreme Court has counseled that "[p]romissory estoppel

---

[275] 2006 WL 905347, at *14.

[276] *Id.*; *see also* Williston on Contracts, *supra*, § 8:4 ("[I]f it were generally applied it would extend greatly the liability of promisors, and, of course, it is opposed to the weight of authority.").

[277] Wolfe & Pittenger, *supra*, § 15.02[c]; *see also* Williston on Contracts, *supra*, § 8:7 ("[I]t is clear under both version of the Restatement that a mere statement of opinion or future intent, or any other statement that is either not forward-looking or does not involve an undertaking by the putative promisor, will not satisfy the first requirement necessary to invoke the doctrine.").

also does not apply 'where a fully integrated, enforceable contract governs the promise at issue.'"[278]  Nonetheless,

> [C]ompelling reasons of justice exist for enforcing some promises solely on the basis of the promisee's reliance, when injustice cannot otherwise be avoided, when the promise has led the promisee to incur any substantial detriment on the faith of it, and when the promisor not only intended the reliance, but also should reasonably have expected that it would occur.[279]

The doctrine of promissory estoppel has been applied "to instances where the promises were made in a business context," where "consideration and other contractual formalities would ordinarily be expected."[280]

Chao's claim for promissory estoppel suffers the same flaw as her other claims—she has failed to prove the existence of an actionable promise that was not fulfilled.  To satisfy this element, "[t]he alleged promise must be a real promise . . . and reasonably definite and certain."[281]  As explained in the breach of contract section above, any promise

---

[278] Wolfe & Pittenger, *supra*, § 15.02[c] (quoting *SIGA Techs., Inc. v. Pharmathene, Inc.*, 67 A.3d 330, 348 (Del. 2013)); *see also Alltrista Plastics, LLC*, 2013 WL 5210255 at *9 ("[C]ourts must be careful that they do not apply the doctrine of promissory estoppel when there is an existing contract that governs the issue before the Court."); *Olson v. Halvorsen*, 2009 WL 1317148, at *12 (Del. Ch. May 13, 2009) (holding that the plaintiff's estoppel claims failed in part because "the alleged promises" were "inconsistent with the terms of the operating agreements" at issue and that "[u]nder Delaware law, a party cannot assert a promissory estoppel claim based on promises that contradict the terms of a valid, enforceable contract") (citation and internal quotation marks omitted).

[279] Williston on Contracts, *supra*, § 8:4.

[280] *Id.* § 8:5.

[281] *Black Horse Cap., L.P. v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *21 (Del. Ch. Sept. 30, 2014) (internal quotation marks omitted); *see also Schaeffer*, 2021 WL 5579050, at *1 (holding that a promissory estoppel claim failed because the claim "lack[ed] clear and convincing evidence of a sufficiently definite promise"); Williston on Contracts, *supra*, § 8:7 ("Despite . . . countless decisions requiring any promise which is to serve as the basis

that Chao would receive perpetual equity in Riverside was not definite enough on material terms to satisfy the first element.[282]  During her employment, she received the benefits of any agreement with the Frosts that was reached.  Therefore, there is no injustice to be cured, and Chao's promissory estoppel theory has nowhere to land.[283]  Chao has not proven the elements of promissory estoppel.

## III.    CONCLUSION

A few final remarks: Each side has sought fee-shifting and cost-shifting under various theories.  The court has carefully examined those arguments and determined that there is no basis for shifting fees or costs in this case.  Each side will bear its own expenses.  Also, Chao represented herself in this litigation.  She was a formidable opponent.  The

---

for a promissory estoppel claim or defense to be as clear and well defined as a promise that could serve as an offer, or that otherwise might be sufficient to give rise to a traditional contract supported by consideration, a substantial number of courts have indicated that the contours of the promise need not be as definite, clear or certain as might be necessary if the contract were one based upon a consideration or an actual offer and acceptance, although the clear majority of the cases are to the contrary.  Nevertheless, because the principal goal of the Doctrine of Promissory Estoppel is avoidance of the injustice that can result when a promise substantially, detrimentally and foreseeably acts or forbears from acting in reliance on a promise that is calculated to and in fact does induce precisely that action or forbearance, the minority rule has much to recommend it.").

[282] *See, e.g.*, *In re US W., Inc. Sec. Litig.*, 201 F. Supp. 2d 302, 309 n.1 (D. Del. May 2, 2002) ("It is well-established that implied statements cannot form the basis of promissory estoppel because of their inherent uncertainty.")  (internal quotation marks omitted).

[283] *See, e.g.*, *SIGA Techs., Inc.*, 67 A.3d at 334 ("[A] promise expressed in a fully enforceable contract cannot give rise to a promissory estoppel claim."); *TrueBlue, Inc. v. Leeds Equity P'rs IV, LP*, 2015 WL 5968726, at *5 (Del. Super. Ct. Sept. 25, 2015) ("The doctrine of promissory estoppel is a quasi-contractual remedy designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement.") (internal quotation marks omitted); *In re Morrow Park Hldg. LLC*, 2020 WL 3415649, at *20 n.128 (Del. Ch. June 22, 2020) ("Of course, the promissory estoppel claim could not survive if it were based on a valid contract.").

court gave her broad latitude to build her case throughout, and the voluminous record reflects the fruits of that effort. In the end, the record simply did not support her claims.

Judgment is entered in favor of the Riverside Parties. Grace I Ching Chao is not a Riverside Member and the 2015 LLC Agreement is Riverside's governing instrument. The Riverside Parties shall prepare a form of order implementing this decision within ten days, providing Chao at least five days to review the form.